UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION
CIVIL ACTION NO. 3:12-CV-00154-TBR

LORA MADONNA JACKSON, *et al.*,                                    PLAINTIFFS

v.

E-Z-GO Division of TEXTRON, INC., *et al.*,                        DEFENDANTS

## MEMORANDUM OPINION AND ORDER

Currently pending before the Court are several motions in limine filed by the parties in anticipation of the upcoming trial scheduled in this matter. Defendant E-Z-GO filed five of these, [DN 165; DN 167; DN 168; DN 169], and Plaintiffs filed several motions in one document, [DN 173.] All motions have been responded to. [DN 186; DN 189; DN 190; DN 191; DN 194.] Fully briefed, these matters are now ripe for adjudication. For the reasons explained in detail below, Defendant E-Z-GO's Motion in Limine to Exclude Spoliation is **DENIED**; its Motion in Limine to Exclude Computer Simulations is **DENIED**; its Motion in Limine to Exclude Patents is **GRANTED**; and its Motion in Limine to Exclude Coroner and Scene Photographs is **DENIED**. Plaintiffs' Motion in Limine, which includes several motions, is **GRANTED IN PART AND DENIED IN PART**.

## BACKGROUND

This lawsuit arises out of a rollover accident involving an electric golf cart that led to the tragic death of one of the passengers, fifteen year-old Jordan Kori Jackson, on July 25, 2010 in Grayson County, Kentucky. [*See* DN 1-2 (Complaint).] The golf cart (the "Vehicle") was a 1993 E-Z-GO PC-4X manufactured and sold by Defendant E-Z-GO ("Defendant" or "E-Z-GO"). Jordan Jackson was a passenger in the front right seat of the Vehicle. Three other teenage passengers were also present: Molly Kyle, who was driving, Andrew O'Neill, whose parents

1

owned the Vehicle, and Samantha Compton. Both Andrew O'Neill and Samantha Compton were sitting in the back of the Vehicle at the time of the incident.

Lora Madonna Jackson, Jordan's mother and the administratrix of her estate, and Carmine T. Jackson, administratrix of the estate of Charles T. Jackson Jr., Jordan's father, brought the instant lawsuit against Defendant E-Z-GO Division of Textron, Inc. Herein, Plaintiffs allege that the Vehicle's design was defective, that E-Z-GO failed to provide adequate warnings regarding its safe operation, and that E-Z-GO breached express and implied warranties. [*See* DN 1-2 at 4–7.] Plaintiffs also bring negligence and gross negligence claims against Keith and Dianna O'Neill, Andrew O'Neill's parents, alleging that the O'Neills wrongly allowed their then-underage son and others to operate the Vehicle on the day of the incident. [DN 1-2 at 7–8.] This matter is scheduled for a jury trial beginning on August 1, 2018.

## STANDARD

Using the inherent authority to manage the course of trials before it, this Court may exclude irrelevant, inadmissible, or prejudicial evidence through *in limine* rulings. *See Luce v. United States*, 469 U.S. 38, 41 n.4 (1984) (citing Fed. R. Evid. 103(c)); *Louzon v. Ford Motor Co.*, 718 F.3d 556, 561 (6th Cir. 2013); *Mahaney ex rel. Estate of Kyle v. Novartis Pharm. Corp.*, 835 F. Supp. 2d 299, 303 (W.D. Ky. 2011). Unless such evidence is patently "inadmissible for any purpose," *Jonasson v. Lutheran Child & Family Servs.*, 115 F.3d 436, 440 (7th Cir. 1997), though, the "better practice" is to defer evidentiary rulings until trial, *Sperberg v. Goodyear Tire & Rubber Co.*, 519 F.2d 708, 712 (6th Cir. 1975), so that "questions of foundation, relevancy and potential prejudice may be resolved in proper context," *Gresh v. Waste Servs. of Am., Inc.*, 738 F. Supp. 2d 702, 706 (E.D. Ky. 2010). A ruling *in limine* is "no more than a preliminary, or advisory, opinion." *United States v. Yannott*, 42 F.3d 999, 1007 (6th Cir. 1994) (citing *United*

*States v. Luce*, 713 F.2d 1236, 1239 (6th Cir. 1983), *aff'd*, 469 U.S. 38). Consequently, the Court

may revisit its *in limine* rulings at any time and "for whatever reason it deems appropriate." *Id.*

(citing *Luce*, 713 F.2d at 1239).

DISCUSSION

## A. Defendant's Motions in Limine

### 1. Motion in Limine to Exclude Evidence of Spoliation

First, Defendants move to exclude testimony by witnesses or references by counsel to any

spoliation of evidence Plaintiffs allege Defendants may have engaged in. [DN 165.] According

to Defendant, "[i]n 2004 Textron converted its Legal Department matter management system

from a discontinued and increasingly inadequate management system called 'Corporate

LawPack' to the current management system named 'TeamConnect.'" [DN 165-1 at 2–3.]

Defendant states that its "document retention schedule relating to 'Litigation Files' was dated

1997, and preceded the data transfer [conducted in 2004] by 7 years and the accident in this case

by 13 years." [*Id.* at 8.] Pursuant to that 1997 "records management policy," Defendant's

practice was to "maintain[ ] litigation files only for three years following closure" of a claim or

lawsuit. [*Id.*]

> Thus . . . only information relating to claims or lawsuits that were open in 2004,
> or those that had been closed within the three years prior to the 2004
> implementation (including matters that commenced well back into the 1990's,
> over a decade before this accident ever occurred), were entered into the
> TeamConnect Legal Matter Management System.

[*Id.*] In its motion, Defendants argue that "[t]he fact that the Textron Legal Department followed

its records management policy and did not transfer litigation files closed prior to 2001 (*i.e.* three

years) when it implemented in 2004 is not improper." [*Id.* at 10.] Defendants contend that

"[t]here was no business need or requirement for the Textron Legal Department to retain such

3

closed records. Files were preserved for all pending litigation and, more significantly, there was no duty to preserve evidence for this case because the accident and accompanying lawsuit had not yet occurred." [*Id.*] Moreover, Defendants rely on the United States Supreme Court's recognition that "'[d]ocument retention policies,' which are created in part to keep certain information from getting into the hands of others, including the Government, are common in business . . . It is, of course, not wrongful for a manager to instruct his employees to comply with a valid document retention policy under ordinary circumstances." *Arthur Andersen LLP v. United States*, 544 U.S. 696, 704 (2005).

Plaintiffs, however, contend that Defendant spoliated evidence due to its "actions in 2004 when it implemented its TeamConnect litigation database and destroyed all of the data before 2001, in its previous litigation database, Corporate Law Pack." [DN 194 at 2.] In support of that argument, Plaintiffs argue that Defendant "conceded that it knew from experience that evidence about prior incidents could be used adversely to the company in the product liability cases against it." [*Id.* (citing John Rupp Deposition).] According to Plaintiffs, Defendant's in-house legal counsel, John Rupp, testified that he "knew that other incidents could be admitted against Textron in civil suits, and could be prejudicial to Textron's defense." [*Id.* (citing Rupp Deposition).][1]

In their proposed jury instructions, Plaintiffs request that the Court include an adverse inference instruction advising the jury that Defendant "destroyed . . . documents and information in 2004" and that the jury is "instructed to infer that the documents and information about other incidents and other lawsuits involving rollovers of golf cars, personnel carrier vehicles, and related vehicles that Textron obtained and collected before and after the date of manufacture of the E-ZGO vehicle would be, if available, adverse to Textron and favorable to Plaintiffs." [DN

---

[1] Though both parties reference Rupp's deposition testimony, neither party attaches that testimony to their briefing.

178-1 at 4 (Proposed Jury Instructions).] However, Plaintiffs further argue "that a ruling of spoliation will be justified at the close of evidence, and that it is clearly premature at this point to conclude to the contrary." [DN 194 at 1.]

"Spoliation is 'the intentional destruction of evidence that is presumed to be unfavorable to the party responsible for its destruction.'" *Ross v. Am. Red Cross*, 567 F. App'x 296, 301–02 (6th Cir. 2014) (quoting *United States v. Copeland,* 321 F.3d 582, 597 (6th Cir. 2003)). In 2010, the Sixth Circuit explained the standard for giving an adverse inference instruction on the basis of spoliation as follows:

> [A] a party seeking an adverse inference instruction based on the destruction of evidence must establish (1) that the party having control over the evidence had an obligation to preserve it at the time it was destroyed; (2) that the records were destroyed "with a culpable state of mind"; and (3) that the destroyed evidence was "relevant" to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense.

*Beaven v. U.S. Dep't of Justice*, 622 F.3d 540, 553 (6th Cir. 2010). In adopting this standard, the Sixth Circuit further elaborated:

> Thus, an adverse inference for evidence spoliation is appropriate if the Defendants " 'knew the evidence was relevant to some issue at trial and ... [their culpable] conduct resulted in its loss or destruction.' " *Hodge v. Wal–Mart Stores, Inc.,* 360 F.3d 446, 450 (4th Cir.2004) (quoting *Vodusek v. Bayliner Marine Corp.,* 71 F.3d 148, 156 (4th Cir.1995)). This depends on the alleged spoliator's mental state regarding any obligation to preserve evidence and the subsequent destruction. An obligation to preserve may arise "when a party should have known that the evidence may be relevant to future litigation," *Kronisch v. United States,* 150 F.3d 112, 126 (2d Cir.1998), but, if there was "no notice of pending litigation, the destruction of evidence does not point to consciousness of a weak case" and intentional destruction, *554 *Joostberns v. United Parcel Servs., Inc.,* 166 F. App'x 783, 797 (6th Cir. 2006) (unpublished opinion) (applying federal law). "[T]he 'culpable state of mind' factor is satisfied by a showing that the evidence was destroyed 'knowingly, even if without intent to [breach a duty to preserve it], or *negligently.' " *Residential Funding Corp.,* 306 F.3d at 108 (quoting *Byrnie,* 243 F.3d at 109).

*Id.* at 553–54. Rule 37(e) of the Federal Rules of Civil Procedure, which was amended to its current version in 2015, after the Sixth Circuit's decision in *Beaven*, likewise provides guidance on spoliation sanctions. Specifically, Rule 37(e) provides:

> **(e) Failure to Preserve Electronically Stored Information.** If electronically stored information that should have been preserved in the anticipation or conduct of litigation is lost because a party failed to take reasonable steps to preserve it, and it cannot be restored or replaced through additional discovery, the court:
>
> > **(1)** upon finding prejudice to another party from loss of the information, may order measures no greater than necessary to cure the prejudice; or
> >
> > **(2)** only upon finding that the party acted with the intent to deprive another party of the information's use in the litigation may:
> >
> > > **(A)** presume that the lost information was unfavorable to the party;
> > >
> > > **(B)** instruct the jury that it may or must presume the information was unfavorable to the party; or
> > >
> > > **(C)** dismiss the action or enter a default judgment.

Fed. R. Civ. P. 37(e). Rule 37(e) permits the imposition of a sanction only if, at a minimum, "electronically stored information that *should have been preserved in the anticipation or conduct of litigation* is lost because a party failed to take reasonable steps to preserve it." Fed. R. Civ. P. 37(e) (emphasis added). Further, it permits an adverse inference instruction to the jury "*only upon finding* that the party acted with the i*ntent to deprive another party of the information's use in the litigation*." Fed. R. Civ. P. 37(e)(2) (emphasis added).

In its motion to exclude, Defendant argues that "Plaintiffs should be precluded from making any arguments or introducing evidence suggesting an 'improper' disposition of old claims or a suggestion of improper conduct on the part of E-Z-GO or Textron, or any alleged 'spoliation' of evidence." [DN 165-1 at 12–13.] In support of this argument, Defendant argues, first, that "[t]he Jackson accident did not occur until July 25, 2010, some 6 years after the

conversion and 13 years after the document retention schedule was established" and "Jackson's complaint was not filed for yet another year, in 2011" and therefore, it had no reason to anticipate "future litigation" in 2004 when it converted to TeamConnect. [*Id.* at 12.] Second, Defendant argues that Plaintiffs cannot show the requisite prejudice from the unavailability of certain documents because they have since "received from Travelers the very information it claims was not preserved by Textron." [DN 165-1 at 13.]

In their response, Plaintiffs argue that "[a] duty to preserve arises 'when a party should have known that the evidence ***may*** be relevant to ***future*** litigation[.]'" [DN 194 at 6 (citing *Beaven*, 622 F.3d at 553).] According to Plaintiffs, that fact that prior incidents could be relevant to any future products liability litigation in general established Defendant's duty to preserve documents in 2004.

The Sixth Circuit has explained that "[w]hether an adverse inference is permissive or mandatory is determined on a case-by-case basis, corresponding in part to the sanctioned party's degree of fault." *Automated Sols. Corp. v. Paragon Data Sys., Inc.*, 756 F.3d 504, 513 (6th Cir. 2014) (quoting *Flagg v. City of Detroit,* 715 F.3d 165, 178 (6th Cir. 2013)). At this time, the Court agrees that Plaintiffs have not made the requisite showing of fault, whether through negligence or intent, necessary for an adverse inference instruction. However, the Court will permit Plaintiffs to raise this issue again in chambers when the parties and the Court discuss jury instructions at the end of trial.

With regard to Defendant's request to exclude evidence of or reference to spoliation at all during trial, however, the Court will not go so far. Though the standard for proffering an adverse inference instruction requires a showing of a certain degree of fault and resulting prejudice, the standard of relevance for admissibility at trial is much lower. *See Yoder & Frey Auctioneers, Inc.*

*v. EquipmentFacts, LLC*, 774 F.3d 1065, 1070–71 (6th Cir. 2014) (Explaining that the showing of "relevance" necessary for an adverse inference instruction requires "something more than sufficiently probative to satisfy Rule 401 of the Federal Rules of Evidence."). In the context of introducing evidence of spoliation, as opposed to tendering an adverse inference instruction, "[i]f relevant, courts have allowed spoliation evidence at trial." *VSI Holdings, Inc. v. SPX Corp.*, No. 03-CV-70225-DT, 2006 WL 568333, at *2 (E.D. Mich. Mar. 7, 2006) (citing *United States v. Mendez-Ortiz,* 810 F.2d 76, 79 (6th Cir. 1986)); *see also Harris v. Hogle*, No. 1:05-CV-815, 2010 WL 2302309, at *2 (W.D. Mich. June 4, 2010) (Denying adverse inference instruction prior to trial because "Plaintiff ha[d] presented little evidence in support of his claim for spoliation sanctions," however, acknowledging that, "[p]resumably, further facts will be developed at trial."); *Ross v. Am. Red Cross*, No. 2:09-CV-00905-GLF, 2012 WL 2004810, at *6 (S.D. Ohio June 5, 2012), *aff'd*, 567 F. App'x 296 (6th Cir. 2014) ("Recently, this Court denied Plaintiff's motion for, among other things, an adverse inference of negligence as a discovery sanction for the Red Cross's 'spoliation' of the post-September 19, 2008 DRIRs . . . The Court's ruling does not, however, necessarily mean that the Red Cross is entitled to keep from the jury the fact that the post-September 19, 2008 DRIRs that once existed are now gone. Indeed, this Court noted that '[t]he fact that the documents are missing is something the Plaintiff can explore on cross-examination with an appropriate witness.' Contrary to the Red Cross's contention that any 'spoliation' of the DRIRs is not relevant to any issue in the case, the loss of the evidence could conceivably affect the weight the jury may give to the testimony of Red Cross witnesses regarding any 'aftercare' provided to Plaintiff. Finding no basis to categorically exclude evidence or argument concerning 'spoliation' of the DRIRs at this time, the Court **DENIES** the Red Cross's motion in limine to exclude them.").

Here, Plaintiffs argue that "'[o]ther incident' proof is some of the most persuasive testimony that can be offered in a products case." [DN 194 at 8.] Accordingly, to the extent Plaintiffs are unable to provide the jury with examples of other incidents that may have been recorded prior to 2004, Plaintiff wishes to inform the jury why such records are unavailable. The Court finds this evidence is relevant and admissible under Rule 401 of the Federal Rules of Evidence. Accordingly, the Court will allow Plaintiffs to put on evidence of what they believe was spoliation of evidence in 2004. Therefore, Defendant's motion in limine is denied.

## 2. Motion in Limine to Exclude Computer Simulations

Defendant also moves "to exclude the computer simulations offered by Kirstopher Seluga on the grounds that Mr. Seluga's computer simulation models for rear wheel, front-wheel, and all-wheel braking do not meet FRE 702 and should be excluded under FRE 402 and 403." [DN 167 at 1.] Defendant made the same arguments in its motion to exclude the report and testimony of Plaintiffs' expert Kristopher Seluga pursuant to Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). [DN 132.] The Court addressed Defendant's arguments regarding Seluga's computer simulations and the applicable law in its Memorandum Opinion and Order ruling on all parties' *Daubert* motions. [DN 198 at 49–58.] Therein, the Court found Seluga's computer simulations to be reliable and admissible and noted that any deficiencies Defendant alleges can be addressed at trial during cross-examination. [*Id.* at 57–58.] On the basis of that ruling, and the lengthy analysis the Court underwent in its previous Memorandum Opinion and Order, Defendant's motion to exclude Seluga's computer simulations is denied.

### 3. Motion in Limine to Exclude Patents

Next, Defendant moves "to preclude plaintiffs from presenting evidence or argument relating [to] regenerative braking concepts patents because there is no evidence of feasibility or availability to E-Z-GO prior to manufacture of the vehicle in question." [DN 168-1 at 1.] Two of Plaintiffs' experts, Andrew Lawyer and Kristopher Seluga, cite to various United States Patents in support of their opinions that regenerative braking, a type of speed governing system, could have been implemented in the Vehicle when it was manufactured in 1993 and that regenerative braking would have constituted a feasible, safer alternative design.

Lawyer cites U.S. Patents 4,242,617 and 4,730,151. Patent No. 4,242,617 was issued on December 30, 1980 (the "1980 Patent") and is for an "electric vehicle having dynamic braking and regeneration." [DN 149-4.] Patent No. 4,730, 151 was issued on March 8, 1988 (The "1988 Patent") and is for "continuous field control of series wound motors." [DN 149-5.] In his report, Lawyer cites to these two patents for the proposition that "[t]he concept of speed limiting, and/or dynamic braking/plug braking/regenerative braking, has been a known concept in the electrical powered vehicle industry since at least 1980." [DN 119-1 at 5.]

In his report, Seluga writes:

> [T]he vehicle could have been equipped with a speed governing system that would have automatically limited the vehicle's speed to a safe level, even when traveling downhill. Such regenerative braking systems were invented long before the manufacture of the subject vehicle and had been implemented in other applications such as trains and concept electric automobiles decades prior.

[DN 113-1 at 25.] In support of this statement, Seluga cites, in footnotes, U.S. Patents 3,984,743, 4,008,423, 4,389,602, and 5,261,025. [*Id.* at 25 n.49–52.] Patent No. 3,984,743 was issued on October 5, 1976 (the "1976 Patent") for a "Regenerative Braking Controller for D.C. Motor." Its

abstract states, in part, that it is for a "[r]egenerative braking controller for controlling a direct current motor adapted to drive a railway tramcar, an electric automobile or the like."

Patent No. 4,008,423 was issued on February 15, 1977 (the "1977 Patent") for an "Electrically Propelled Vehicle." Its abstract states, in part, that it covers "A propulsion system for an electrical vehicle including a linear proportional controller operable in a plurality of modes for operating a d.c. drive motor via power derived from a propulsion battery."

Patent No. 4,389,602 was issued on June 21, 1983 (the "1983 Patent") and is for an "Electric Motor Controller." Its abstract states that it covers "An electronic controller for DC motors is provided which is particularly adapted for use on electric vehicles."

Patent No. 5,261,025 was issued on November 9, 1993 (the "1993 Patent") and covers "Method and Apparatus for DC Motor Speed Control." Its abstract states: "In a preferred embodiment, a high-frequency, pulse-width-modulated, power-transistor, DC motor speed controller having current limiting in both drive and regenerative modes, essentially constant ramping rates regardless of whether or not the operator switches to neutral before changing direction."

Defendant makes multiple arguments in its motion in limine as to why these patents should be excluded from trial. Specifically, Defendant argues that "Plaintiffs do not even attempt to show how these 'concepts in design' were 'technologically practicable' under the circumstances in 1993 to a vehicle the form, size, weight, and expected performance of an electric powered golf car or personnel carrier." [DN 168-1 at 2 (citing *Toyota Motor Corp. v. Gregory*, 136 S.W.3d 35, 41–42 (Ky. 2004)). Additionally, Defendant argues that the patents do not "accomplish the Plaintiffs' stated goal of limiting the top speed of an electric vehicle while coasting downhill" because two of the Patents "note, at the time of issuance, current technology

meant that use of a regenerative brake system in a battery powered vehicle would require that vehicle being placed in a 'coasting' condition during the transition to and from regenerative braking, and 'involves a risk that a crash may occur in the coasting state before the driver treads the foot brake pedal to operate a mechanical brake.'" [*Id.* at 3 n.1.] Next, Defendant argues that the patents are irrelevant for many reasons, including that "a cursory review of these identified patents discloses that they are for unrelated vehicles" and that they "do not contain any safety testing or reference to such testing comparing the brake system on the subject PC-4X during this accident with the methods of regenerative braking proposed in the third-party patents for *different applications and vehicles* under *different operational conditions*." [*Id.* at 3, 6.]

Defendant relies heavily on the Fifth Circuit's decision in *Casey v. Toyota Motor Engineering & Manufacturing North America, Inc.*, in which the court held that "[a] single patent or patent application may form the basis of an expert's conclusion that there exists a safer alternative design, but only if the patent or patent application, together with the expert's analysis of it, proves all of the elements of a safer alternative design." 770 F.3d 322, 331 (5th Cir. 2014). Applying *Casey*, Defendant argues that "there is no research or showing by Mr. Lawyer [or Mr. Seluga] that the patents relate to any components manufactured by other companies, actually known and available to E-Z-GO prior to the manufacture and first sale of in June 1993, and demonstrated through industry testing as suitable for use in E-Z-GO electric vehicles." [*Id.* at 8.] Finally, Defendant argues that "[n]either Mr. Seluga nor Mr. Lawyer meet the FRE 702 requirements for being able to opine on the interpretation on patent claims" through expert testimony. [*Id.* at 9.]

In response, Plaintiffs argue that they:

seek to introduce patents that were issued before the date of manufacture of the subject E-Z-GO vehicle that involve devices utilizing regenerative braking

technology to prove that regenerative braking technology had been invented long before the manufacture of the subject vehicle and that it was technologically feasible for Textron to have utilized regenerative braking when it manufactured the subject vehicle. Contrary to Textron's arguments, it makes no difference whether the regenerative braking technology discussed in the patents was used with golf cars and personnel carriers versus other types of vehicles. The patents show that the regenerative braking technology already had been invented and was used in numerous applications, and, therefore, the patents certainly have a tendency to make more probable the fact that regenerative braking was technologically feasible prior to the manufacture of the subject vehicle. Because regenerative braking was technologically feasible, Textron could have chosen to utilize such a design for the E-Z-GO vehicle in 1993.

[DN 189 at 3–4.] According to Plaintiffs, Defendant

ignores the expert testimony of Plaintiffs' experts and argues that the patents should be excluded from trial because the patents, on their faces, do not establish that they are safe or that they are comparatively safer than the design of the E-Z-GO vehicle. Even if Textron is correct (it is not), there is no rule or law that would preclude Plaintiffs from relying on the expert testimony of Seluga and Lawyer to show that Plaintiffs' proposed alternative utilizing regenerative braking is safe and would be safer than the subject vehicle without such technology.

[*Id.* at 6.] In support of this argument, Plaintiffs cite *Heatherly v. National Presto Industries, Inc.*, in which the District Court for the Western District of Texas held that "[t]he fact the design may have been conceptual does not necessarily mean the design was not practical and feasible at the time of manufacture." No. SA-07-CA-0062-FB, 2008 WL 11334519, at *4 (W.D. Tex. Dec. 3, 2008). However, the Court finds *Heatherly* to be distinguishable from this case. There, the expert specifically "explain[ed] his opinion as to whether the Kitchen Kettle could have been designed with a magnetic break-away cord at the time of the accident, and how this design might have prevented harm to plaintiff." *Id.* at 3. Here, neither Lawyer nor Seluga have actually interpreted and applied the language of the patents to explain how the designs could have been incorporated into the Vehicle at issue in this case in 1993.

Additionally, in *Heatherly*, the court explained that "the patents in this case can be compared to the Kitchen Kettle by virtue of defendant's use of these [exact] patents when

applying for its own 'quick release' power cord patent." *Id.* No such reliance by Defendant on the patents at issue exists in this case. Moreover, in *Heatherly*, the proposed alternative design at issue was relatively simple – a different type of chord for an electric kettle. Here, by contrast, the concepts of separately excited motors and regenerative braking are quite complex. The patents use complicated language that individuals not trained in the industry likely would not understand. These include terms and phrases such as: "series circuit composed of the armature and the field coil of the motor and a smoothing reactor," "a chopper circuit connected in parallel with the series circuit and a diode inserted between . . . ," [*see* 1977 Patent], "a chopper is employed to divide the current into a series of pulses," " a main current limiter and a back-up limiter," [*see* 1983 Patent], "a high-frequency, pulse-width-modulated, power-transistor," "essentially constant ramping rates," [*see* 1993 patent], "alternator is used to recharge the storage battery during periods of less than maximum vehicle velocity," [*see* 1980 Patent], "direct current electric traction motor," "variable mark-space ratio power regulator responsive to a motor current command signal," "[T]he propulsion mode is either a series connected mode or a separately excited mode. The regenerative mode simulates the retarding effects of an internal combustion engine driven vehicle, while recover the kinetic energy of the vehicle by the generation of current to recharge the power source." [*see* 1988 Patent].

Without expert testimony to explain these highly industry-specific terms and explain how the designs and concepts enumerated in the patents could have been implemented into the Vehicle in 1993, the Court agrees with Defendants that the patents are inadmissible. While, as Plaintiffs argue, they may be relevant under Federal Rule of Evidence 401, the Court finds that any probative value the Patents have "is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, [and] misleading the jury." Fed. R. Evid. 403. *See, e.g.*,

*Hendricks v. Ford Motor Co.*, No. 4:12CV71, 2012 WL 7958760, at *1 (E.D. Tex. Oct. 15, 2012) ("Based on the information presently before the Court, the patents Plaintiff wishes to introduce have not been tested, examined, or analyzed by her, or any, expert. Plaintiff has presented no evidence that her expert has evaluated and tested the patents to determine whether they are feasible designs or whether they are in fact safer . . . For these reasons, the Court finds that the patents should not be admitted into evidence at this time."); *Brawn v. Fuji Heavy Indus., Ltd.*, 817 F. Supp. 184, 186 (D. Me. 1993) ("On the second part, his patent search evidence (proposed elsewhere) does not reveal whether his 'design alternatives' are feasible or what their costs would be and is therefore inadmissible under both Rule 702 and Rule 403."). Accordingly, Defendant's motion in limine to exclude patent evidence is granted.

### 4. Motion in Limine to Exclude Coroner and Scene Photographs

Next, Defendant moves to exclude certain post-accident scene, hospital, and coroner photographs of Jordan Jackson's injuries and the accident area, as well as any references by Plaintiff thereto. [DN 169.] Defendant argues that such photographs, and Plaintiffs' references to them, would contravene Rule 403 of the Federal Rules of Evidence. In response, Plaintiffs contend that E-Z-GO cannot show the requisite amount of prejudice in order to justify the exclusion of these photographs and, further, that numerous experts are relying on contemporaneous photographs of the scene and that they are highly probative.

Rule 403 provides that "[t]he court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403. The Sixth Circuit has held that "unfair prejudice within the context of Rule 403 means an undue tendency to suggest a decision on an improper basis,

commonly, though not necessarily, an emotional one." *United States v. Hathaway*, 798 F.2d 902, 909 (6th Cir. 1986) (quoting Fed. R. Evid. 403 advisory committee's note) (internal citations omitted). Of course, "[e]vidence that is prejudicial only in the sense that it paints the defendant in a bad light is not unfairly prejudicial pursuant to Rule 403." *United States v. Chambers*, 441 F.3d 438, 456 (6th Cir. 2006).

Defendant refers to, but does not provide copies of, various photographs taken by the sheriff's department, the hospital, the coroner, and some apparently taken by Jordan's uncle, Kris Whittington, all of which it contends are excessively graphic and serve no true evidentiary purpose that could not be better accomplished by other, less prejudicial means. In Defendant's view, the probative nature of these graphic photographs is slight, while "[t]he primary danger from the[m]…is 'emotionalism' – *i.e.,* that the graphic photos will 'arouse biases and sympathies, provoke animosities and inflame passions that obstruct careful thought and judgment.'" [DN 169-1, at 3-4 (quoting *Hall v. Commonwealth*, 468 S.W.3d 814, 824-25 (Ky. 2015).] Defendant also points to the fact that "[t]here is no material dispute as to the manner of death" in this case, and proffers that "evidence relating to the scene and manner of the accident is not scarce." [*Id.* at 4.] According to Defendant, Plaintiff would not suffer any prejudice by being required by this Court to rely upon other witness testimony, the coroner's post-mortem examination, and what Defendant refers to as "non-prejudicial photographs." [*Id.* at 4-5.]

In response, Plaintiff points to the graphic nature of the accident which underlies this case and argues that, while the photographs in question are necessarily graphic to a certain extent, they are indicative of her pain and suffering claim and highly probative of displaying precisely how Jordan died. Plaintiff also points to the fact that certain experts such as Kristopher Seluga, David Bizzak, Andrew Lawyer, and Frank Entwisle all rely at least in part upon photographs

taken at the scene of the accident in forming and articulating their opinions in this matter. Thus, given the highly probative nature of these photographs, the Court should not exclude them.

In reviewing the arguments of both sides, the Court finds persuasive Plaintiffs' argument that "no particular photograph is identified" by Defendant in terms of *which* photographs Defendant believes should be excluded. [DN 191 at 3.] In its instant motion, E-Z-GO has pointed to the *setting* in which certain photographs were taken (the scene of the accident and later at the hospital), as well as who took these photographs (the sheriff's department, the coroner, and Jordan's uncle), but no photographs are attached to the instant motion, and the Court cannot find any similarly-described photographs in the Record. Without having examined these photographs or having heard the parties' arguments regarding any particular photograph, the Court does not have sufficient information to determine whether such photographs should be excluded under Rule 403 as unfairly prejudicial. Accordingly, the Court will deny Defendant's motion at this time, however Defendant will be permitted to raise this issue should it arise at trial. Before either party introduces any allegedly "unfairly prejudicial" photographs of the type referenced herein, they must approach the bench.

## B. Plaintiffs' Motions in Limine

In just fourteen pages, Plaintiffs make sixteen motions in limine. [*See* DN 173.] Though some are detailed enough such that the Court has sufficient information to rule now, the Court finds that a ruling on others would be somewhat premature and therefore will defer ruling on those issues if and until they arise at trial.

### 1) Motion in Limine to Exclude Discussion of Comparative Fault

In their first motion in limine, Plaintiffs argue:

> Throughout discovery, Defendant . . . has sought to blame non-settling non-parties for the E-Z-GO vehicle's failure and rollover. In addition, Textron has

argued that wrongdoing on the part of non-settling non-parties somehow eliminates its liability to Plaintiffs. Textron should be precluded from arguing that any action or inaction of any non-settling non-party, including, but not limited to, Molly Kyle, Samantha Compton, and Andrew O'Neill, has any bearing on Textron's actions or inactions.

[DN 173 at 1.] Plaintiffs argue that, under Kentucky's comparative fault statute, "[f]ault cannot be apportioned to any non-settling non-parties." [*Id.* at 2 (citing Ky. Rev. Stat. Ann. § 411.182(1), (4)).]

Plaintiff additionally argues that Defendant "should be precluded from making any arguments contending that the acts or omissions of another somehow relieves them of liability" because "[t]he acts of another, regardless of whether the other person or entity is a party or not a party, will not relieve a defendant of liability unless those acts constitute an 'intervening cause.'" [*Id.* (citing *Montgomery Elevator Co. v. McCullough*, 676 S.W.2d 776, 779–80 (Ky. 1984)).] Plaintiffs argue that "[n]either Co-Defendants, Keith O'Neill and Dianne O'Neill, nor non-parties, Daymond O'Neill, Molly Kyle, Samantha Compton, and Andrew O'Neill, have acted in a manner so highly extraordinary or unforeseeable to relieve Textron of liability for designing and selling the defective E-Z-GO vehicle and failing to provide adequate warnings, especially since the conduct of the E-Z-GO vehicle's occupants was foreseeable to Textron." [*Id.* at 2.]

Plaintiffs further argue that "[i]n addition, Kentucky's comparative fault statute, KRS 411.182, applies to products liability actions. The comparative fault statute does not relieve a party of liability simply because another is also at fault; it simply requires the jury to apportion fault amongst the at-fault parties." [*Id.* at 3.]

In response, Defendant argues Plaintiffs "presume[] that a jury will not conclude that the cause in fact of this accident was to allow these teenagers to operate this vehicle on a public road without supervision. The facts are clear: this accident was caused by an extreme misuse of an

otherwise safe product." [DN 186 at 2.] According to Defendants, "[a]s the facts of this case now established demonstrate, the cause of this accident was not due to any defect in design or manufacture of this vehicle, but instead the failure of the O'Neils to supervise the teenagers while they were in their care, including Molly Kyle's reckless and unlawful operation of the PC-4X. Thus, evidence of the teenagers' unsupervised, poor judgment, is relevant and admissible." [*Id.*]

Defendants argue that, "[i]n making this motion, Plaintiffs confuse 'apportionment' with 'liability.'" [*Id.* at 3.] Defendants state that "[w]hile plaintiffs still must establish liability, E-Z-GO also has the right to argue that its PC-4X was not defective, that co-defendants and the decedent were the cause of this accident, *i.e.* liable, and to seek apportionment to them for such fault pursuant to KRS §411.182." [*Id.*] Defendants argue, however, that "even if Plaintiffs' liability proof existed, so too does evidence of the fault of Molly Kyle, Jordan Jackson and the O'Neils, thereby triggering the allocation mechanisms of KRS §411.182. Plaintiffs' arguments based on KRS §411.182 to prevent E-Z-GO's right to do so are unavailing and their motion should be denied." [*Id.* at 3–4.]

KRS § 411.182 , titled "Allocation of fault in tort actions; award of damages; effect of release," reads, in relevant part, as follows:

(1) In all tort actions, including products liability actions, involving fault of more than one (1) party to the action, including third-party defendants and persons who have been released under subsection (4) of this section, the court, unless otherwise agreed by all parties, shall instruct the jury to answer interrogatories or, if there is no jury, shall make findings indicating:

(a) The amount of damages each claimant would be entitled to recover if contributory fault is disregarded; and

(b) The percentage of the total fault of all the parties to each claim that is allocated to each claimant, defendant, third-party defendant, and person who has been released from liability under subsection (4) of this section.

(2) In determining the percentages of fault, the trier of fact shall consider both the nature of the conduct of each party at fault and the extent of the causal relation between the conduct and the damages claimed.

(3) The court shall determine the award of damages to each claimant in accordance with the findings, subject to any reduction under subsection (4) of this section, and shall determine and state in the judgment each party's equitable share of the obligation to each claimant in accordance with the respective percentages of fault.

Ky. Rev. Stat. Ann. § 411.182. The first section of KRS § 411.182 states "involving fault of more than one (1) *party to the action* . . . ." *Id.* at § 411.182(1). In other words, the statute indicates that, to allocate fault to more than one party, all persons to whom fault will be allocated must be parties *to the action. Id.* Accordingly, Defendant is within its rights under Kentucky law to argue for allocation of fault (if any) between it, the Estate of Jordan Jackson, and the two other Defendants, Keith and Diane O'Neill, as all of these are parties to the instant action. However, Plaintiffs do not appear to take issue with this, as they confine their motion to seeking to preclude Defendant from arguing about actions of "any *non-settling non-party*, including, but not limited to, Molly Kyle, Samantha Compton, and Andrew O'Neill." [DN 173 at 1 (emphasis added).]

The Court agrees, however, as Defendant argues, that many of Plaintiffs' remaining arguments go to liability rather than allocation of fault. For instance, Defendant clearly intends to argue at trial that it was, at least in part, the allegedly unsafe driving of Molly Kyle that caused the accident at in this case, rather than the fact that the Vehicle was defective and unreasonably dangerous. This, the Court believes, is also permissible. Accordingly, the Court is unpersuaded by Plaintiffs' argument that Defendant "also should be precluded from making any arguments contending that the acts or omissions of another somehow relieves them of liability" unless it can establish an "intervening cause." [DN 173 at 2.] The court in *Montgomery Elevator Co. v.*

*McCullough*, upon which Plaintiffs rely, only discussed intervening causes in the context of determining whether the acts of an *elevator purchaser* could cut off the liability of an *elevator manufacturer* regarding a defective elevator. *See Montgomery Elevator Co. v. McCullough by McCullough*, 676 S.W.2d 776, 779 (Ky. 1984) (Explaining the fact pattern at issue as "a products liability claim against a manufacturer based on initial defective design of the product, where the manufacturer claims that adequate notice of the defect and remedial suggestions were offered to the purchaser and that the purchaser's failure to remedy the defect was a superseding or intervening cause. In such circumstances the purchaser who uses the product, knowing of the danger and failing to take remedial measures, is also culpable. The question is whether the purchaser's failure to act cuts off the manufacturer's responsibility.").

The Court disagrees that, in order for Defendant to be able to discuss the quality of Molly Kyle's driving or the alleged encouragement by Jordan Jackson, it must establish an intervening cause. This would only be the case if it was already established that Vehicle was defective and unreasonably dangerous and Defendant sought to argue that Molly Kyle or another's actions *cut off* its liability, as was the case in *Montgomery*. That is not an issue in this case, however. Rather, under Defendant's theory, whether or not Molly Kyle's driving led to the accident at issue in this case goes to the *cause* of the accident, not allocation of fault under KRS § 411.182. According to Defendant, "[t]he evidence at trial will establish that the subject vehicle was not defective. This accident was caused solely by the teenage driver and her encouraging passenger." [DN 186 at 5.] Defendant will be permitted to put on proof as to this theory. To the extent Plaintiffs argue otherwise, their motion is denied.

### 2) Motion in Limine Regarding Proposed Alternative Designs

Second, Plaintiffs argue that "[b]ecause 'feasibility' is the appropriate standard for an alternative design, not 'availability,' any arguments, testimony, or evidence regarding the alleged lack of availability of Plaintiffs' proposed alternative designs at the time of manufacture is irrelevant and should be excluded from trial under Fed. R. Evid. 401 and 402." [DN 173 at 4.]

In response, Defendant argues that "[i]t is undisputed by Plaintiffs' experts that, at the time of the manufacture of the subject PC-4X, no other manufacturer of similar vehicles was using 'front-wheel' only or 'four-wheel' braking, much less 'regenerative" braking.'" [DN 186 at 8.] As the Fourth Circuit noted in applying Kentucky products liability law, "[i]t is, no doubt, significant when no one in an industry manufactures a product in a manner that a plaintiff claims is required." *Sexton By & Through Sexton v. Bell Helmets, Inc.*, 926 F.2d 331, 336 (4th Cir. 1991); *see also Brock v. Caterpillar, Inc.*, 94 F.3d 220, 224 (6th Cir. 1996) (citing *Sexton* with approval).

The Court agrees with Defendant that the fact that, allegedly, no other manufacturer was using Plaintiffs' proposed alternative designs in 1993 when the Vehicle at issue in this case was manufactured is relevant to the feasibility and reasonableness of the alternative designs Plaintiffs propose. *See Hopkins v. Ford Motor Co.*, No. 1:07-CV-00068, 2011 WL 5525454, at *2 (W.D. Ky. Nov. 14, 2011) ("Kentucky implicitly requires proof of a reasonable alternative design."); *Cummins ex rel. C.A.P. v. BIC USA, Inc.*, No. 1:08-CV-00019, 2011 WL 1399768, at *3 (W.D. Ky. Apr. 13, 2011) ("[T]he Court finds that . . . Plaintiff must put forth evidence of a reasonable, alternative design."). Accordingly, Plaintiffs' motion is denied.

**3) Motion in Limine to Exclude Evidence and Argument Regarding Any Alleged Lack of Maintenance of the E-Z-GO Vehicle**

Next, Plaintiffs argue that, "[b]ecause Textron has no expert witness to testify that any alleged lack of maintenance of the E-Z-GO vehicle had anything whatsoever to do with the incident and the rollover of the vehicle, evidence or argument regarding the purported lack of maintenance is irrelevant and inadmissible." [DN 173 at 5.]

In response, Defendant argues that "[t]he condition of the subject PC-4X at the time of this accident is both relevant and admissible. Plaintiffs cite no case law establishing that a fact regarding the condition of the vehicle is excludable at trial. In fact, the condition of the vehicle braking system at the time of the accident will be direct evidence on its actual performance at that point in time." [DN 186 at 10.] Defendant also states, however, that "[t]he full range of context of testimony regarding the condition of the vehicle cannot be anticipated at this time" and therefore that "general categories of evidence, such as the condition of the personnel carrier at the time of the accident, cannot be excluded" at this time. [*Id.* at 10–11.] The Court agrees. At this time, it is unclear what, if any testimony will be offered regarding the condition of the Vehicle. Accordingly, the Court does not feel that it can rule as to the admissibility of such evidence at this time. Therefore, Plaintiffs can raise this issue if and when it arises at trial.

**4) Motion to Exclude Evidence and Argument Regarding Alleged Statutory Violations**

Plaintiffs additionally argue that "Defendants should be precluded from introducing evidence, eliciting testimony, and making arguments regarding whether or not it was 'illegal' to operate the E-Z-GO vehicle on a public roadway and whether or not it was 'illegal' to operate such vehicle without a driver's license." [DN 173 at 5–6.]

In response, Defendant argues that "[t]he fact that Molly Kyle was an unlicensed operator of the PC-4X at the time of the accident and that it was against the law for the PC-4X to have been on Panther Creek Road at the time of the accident is directly relevant to the claims and defenses in this case." [DN 186 at 11.] Defendants further argue that "the relevance of Kyle's lack an operator's license in this situation is as evidence of her lack of training and skill, a situation known to the custodians who allowed her to operate the PC-4X unsupervised." [DN 186.]

In its Memorandum Opinion and Order ruling on all parties' *Daubert* motions, the Court agreed with Plaintiffs that "the fact that the golf cart was being operated on a public road by an unlicensed minor, which is illegal under Kentucky law, is irrelevant to the loss of control of the golf cart." [DN 198 at 92.] Upon further reflection, however, the Court agrees with Defendant that, at the very least, the fact that Molly Kyle was operating the Vehicle without a driver's license on a public road is relevant to Defendant's claim that some fault is attributable to the O'Neills in this case. Specifically, Defendant argues that a contributing factor to the wreck was the fact that the O'Neills permitted Molly Kyle and the other passengers to operate the Vehicle on a public highway without driver's licenses. The warnings on the Vehicle read "For golf course and non highway use only, . . .". And, under Kentucky law, "low speed vehicles" can only operate on highways with posted speeds of 35 mph or less *if*, among other things, "[t]he operator has a valid operator's license in his or her possession." [DN 137 (quoting KRS § 189.282).] Upon second examination, the Court agrees that Defendant can make reference to statutory violations. Accordingly, Plaintiffs' motion is denied.

**5) Motion to Exclude Any Evidence or Argument That Lora Madonna Jackson and Charles T. Jackson, Jr. Had Any Fault and to Preclude Any Apportionment of Fault to Them**

Next, Plaintiffs argue that "Neither Lora Madonna Jackson, nor Charles T. Jackson, Jr. were at the location of the incident when the incident occurred, and there is nothing in the record to suggest that Jordan Jackson's parents were at fault for the incident that led to Jordan's death. Accordingly, Defendants should be precluded from offering any evidence or argument suggesting or implying that Lora Madonna Jackson and Charles T. Jackson, Jr. were at fault, and the Court should preclude any apportionment of fault to them." [DN 173 at 6–7.]

In response, Defendant argues that "[a]pportionment of the amount of fault allocation to Jordan Jackson, and to the derivative claims of Lora Madonna Jackson and Charles T. Jackson, Jr., is appropriate under KRS §411.182." [DN 186 at 12.] According to Defendant, "[t]he claims of Lora Madonna Jackson and Charles T. Jackson, Jr., both through the estate and for their claims of loss of consortium, are reduced by the apportioned fault of their decedent, Jordan Jackson." [*Id.* at 13.] In support, Defendant cites *Norton v. Canadian American Tank Lines*, in which the Western District of Kentucky explained: "Reduction of a loss-of-consortium award according to the injured spouse's share of fault is consistent with the principles of comparative fault" and that "Kentucky's comparative fault statute uses neutral language that does not suggest that only a negligent plaintiff's damages should be reduced." No. CIV.A 06-411-C, 2009 WL 931137, at *3 (W.D. Ky. Apr. 3, 2009). There, the court held that plaintiff "Kelly Norton's award for loss of consortium should be reduced by thirty-five percent, the amount of fault attributed by the jury to Delbert Norton," her injured husband. *Id.*

Defendant states that "[t]o the extent that Plaintiffs' motion regarding apportionment of fault relates solely to Jordan Jackson's parents personal fault, E-Z-GO does not intend to argue

that the parents were individually at fault." [DN 186 at 14.] However, Defendant does intend to argue regarding apportionment fault as to Jordan Jackson which is appropriate, as her Estate is a named party to this action. This, by extension, could affect the recovery (if any) of Jordan's parents, who are also parties to the action. Because KRS § 411.182 allows for allocation of fault among "more than one (1) party to the action," Ky. Rev. Stat. Ann. § 411.182(1), Defendant is permitted to make these arguments. To the extent Plaintiffs argue otherwise, their motion is denied. However, to the extent Plaintiffs simply argue that Defendant should not be permitted to "suggest[] or imply[] that Lora Madonna Jackson and Charles T. Jackson, Jr. were at fault," Plaintiffs' motion is granted.

### 6) Motion to Exclude "Opinion" Testimony About Duty, Which Is a Matter of Law for the Court, Not the Jury

In their next motion, Plaintiffs argue:

> Because the existence of a duty is for the Court, not the jury, Defendants and their experts should be precluded from providing any testimony or "opinions" regarding duty. In particular, Defendants and their experts should be precluded from testifying or arguing about any duty or duties of Plaintiffs or Jordan Jackson. Because the existence of a duty is not for the jury to decide, the purported "opinions" of defense experts regarding duty are irrelevant and will not assist the trier of fact. Thus, such "opinions" are inadmissible under Fed. R. Evid. 401, 402, and 702.

[DN 173 at 7.] In support, Plaintiffs cite *Ostendorf v. Clark Equipment Co.*, in which the Kentucky Supreme Court stated that "[i]n Kentucky, the existence of a duty is a matter of law for the court because '[w]hen a court resolves a question of duty it is essentially making a policy determination.'" 122 S.W.3d 530, 533 (Ky. 2003) (quoting *Mullins v. Commonwealth Life Ins. Co.,* Ky., 839 S.W.2d 245, 248 (1992)).

In response, Defendant states that, "[a]lthough the Court ultimately will instruct the jury as to the law, E-Z-GO will offer evidence that the teenage users and the custodial parents failed

to exercise reasonable care for their own safety." [DN 186 at 14.] However, Defendant states that "[t]o the extent this motion is limited to testimony on the conclusions of law that are within the province of the Court, or that expert testimony suggests to the jury what result to reach in its conclusion, such testimony is outside the scope of FRE 702 and properly excluded." [*Id.* at 15.] Defendant does not contend, however, that it seeks to have its experts testify that Jordan had a specific type of "duty" as a matter of law.

The Court agrees with Plaintiffs on the narrow ground that Defendant's experts cannot offer opinions as to legal "duties" Jordan Jackson may have had. On this limited ground, Plaintiffs' motion is granted. However, the Court also agrees that Defendant is permitted to put on evidence as to Jordan's actions and how those actions allegedly contributed to the incident at issue in the case.

### 7) Motion to Exclude Any Evidence or Argument Regarding Mental Health Issues of Charles T. Jackson, Jr., the Circumstances of His Death, and His Criminal History

In their next motion, Plaintiffs argue:

> Charles T. "Tom" Jackson, Jr. was Jordan's father. Mr. Jackson suffered from mental health issues, and he died in late 2011, well after Jordan's death. Prior to his death, Mr. Jackson was a plaintiff in this action and was pursuing, in his individual capacity, a claim for the loss of care, society, love, companionship, and affection of his daughter, Jordan Jackson. Mr. Jackson's claims were revived by this personal representative, and Carmine T. "Tracy" Jackson, Mr. Jackson's sister and the successor Administratrix of the Estate of Charles T. Jackson, Jr., was substituted as a plaintiff in place of Mr. Jackson. The circumstances related to Tom Jackson's death and his mental health issues are irrelevant to the claims and defenses at issue in this case and should be excluded from trial. *See* Fed. R. Evid. 401 and 403.

> In addition, Tom Jackson's criminal history should be excluded from trial. Mr. Jackson's criminal history is not relevant to the claims and defenses at issue, and, therefore, any evidence or argument regarding his criminal history should be excluded under Fed. R. Evid. 401 and 402. Furthermore, Tom Jackson's criminal history is not admissible under Rule 609 of the Federal Rules of Evidence. Because the requirements of Rule 609 cannot be, and have not been, met

regarding Tom Jackson's criminal history, the Court should preclude any evidence or argument regarding Mr. Jackson's criminal history.

In response, Defendant states that "[a]ctually, Plaintiffs have made the only designation of deposition testimony concerning the mental state of Charles T. Jackson, Jr." [DN 186 at 15.] Defendant further argues that "[c]learly, Mr. Jackson's date of death is relevant on the issue of the claims by his estate for loss of consortium of the decedent." [*Id.* at 16.] Additionally, Defendant contends that it "may offer evidence regarding Mr. Jackson's health and familial issues prior to his death as appropriate to address the testimony introduced by Plaintiffs." [*Id.*]

Generally speaking, the Court agrees with Plaintiffs that Mr. Jackson's mental health issues, death, and criminal history are irrelevant to the issues in this matter. However, as Defendant points out, it may become necessary to address certain issues, such as Mr. Jackson's death, when it comes to his estate's loss of consortium claim. Additionally, should Plaintiffs put on evidence as to any pain and suffering or mental anguish Mr. Jackson suffered following the death of his daughter, Defendant may seek to offer rebuttal testimony as to this issue. Because it is not yet clear how these issues will play out at trial, the Court will reserve ruling on this issue. Before the parties discuss the issues of Mr. Jackson's mental health, death, or criminal history, they are directed to approach the bench.

**8)  Motion to Establish Admissibility of NEISS Data**

Next, Plaintiffs argue that "the Court should rule *in limine* that the NEISS data will be admissible at trial." [DN 173 at 10.] However, as the Court explained in detail in its Memorandum Opinion and Order ruling on all parties' *Daubert* motions, Plaintiffs have not persuaded the Court that the NEISS data possesses the requisite "substantial similarity" to the facts of the incident at issue in this case. [*See* DN 198 at 11–13, 24–27, 68–70.] Accordingly, Plaintiffs motion is denied.

**9) Motion to Exclude Expert Witness Opinions Beyond Those Stated in Textron's Fed. R. Civ. P. 26(a)(2) Disclosures**

Plaintiffs next argue that "Defendants should be prohibited from eliciting any opinion testimony from their experts beyond the disclosures filed pursuant to Fed. R. Civ. P. 26(a)(2) and the Court's pre-trial orders." [DN 173 at 10.] Plaintiffs claim that "[t]o allow an expert witness to testify at trial to opinions that were not timely disclosed pursuant to Fed. R. Civ. P. 26(a)(2) and the Court's pre-trial orders would be an abuse of discretion." [*Id.* at 10–11.]

In response, Defendant states "E-Z-GO's proffered experts will present their disclosed opinions at trial. Fed. R. Civ. Proc. "26(a)(2)(B) does not limit an expert's testimony simply to reading his report.'" [DN 186 at 17 (quoting *Thompson v. Doane Pet Care Co.*, 470 F.3d 1201, 1203 (6th Cir. 2006)).] According to Defendant, "the rule 'contemplates that the expert will supplement, elaborate upon, explain and subject himself to cross-examination upon his report.' This has been done through depositions of E-Z-GO's consultants by Plaintiffs." [*Id.* (quoting *Thompson*, 470 F.3d at 1203).]

Though both parties make, generally speaking, correct statements of the law, it is unclear whether and in what context this issue will arise at trial. Often there is not a bright line to determine whether expert testimony offered at trial is truly a "new opinion." The Court expects the parties not to offer completely new conclusions or obviously new opinions and expects counsel not to cross this line. However, the Court will defer ruling on this issue until such time as it arises at trial.

**10) Motion to Exclude Testimony or Argument Concerning Reputation or Skill of Counsel**

Next, Plaintiffs argue:

> It is not unusual for defense attorneys to attempt to capitalize on the perception that plaintiff's lawyers are somehow disreputable. Such references are oftentimes

made in the context of disguised compliments. These types of references should be precluded. The trial of this case should be about the facts of the case, and not about the practice, skill, or reputation (or lack thereof) of Plaintiffs' counsel.

[DN 173 at 11.]

In response, Defendant states:

E-Z-GO does not anticipate arguing that "plaintiff's lawyers are somehow disreputable", any more than it expects that Plaintiffs will argue that counsel representing manufacturing corporations of highly respected products, or that the corporations themselves, "are somehow disreputable", as put by Plaintiffs. The argument should be related to the evidence, not attempts to engage in character assassination. Both parties should adhere to presentation of facts, not arguing bias or projecting prejudice into the trial.

[DN 186 at 18.] The Court will not allow either party to make arguments about the reputation or skill of opposing counsel at trial. Accordingly, this motion is granted.

## 11) Motion to Exclude Testimony or Argument Regarding Tax Treatment, Present Worth, and Future Value of Any Recovery

Plaintiffs further argue that "[a]ny mention by counsel that any damages recovered are free of federal and state income tax" and "any mention of present worth, future inflation rates, or 'investment vehicles' or value of money received today for future services should be excluded from trial." [DN 173 at 11.] In support, Plaintiffs cite *Paducah Area Public Library v. Terry*, in which the Kentucky Court of Appeals held "that in personal injury actions such as the case at hand the tax liability of claimant is not relevant to the case. It can neither be inquired into on cross-examination or submitted to the jury for consideration in making the award." 655 S.W.2d 19, 24 (Ky. Ct. App. 1983).

In response, Defendant argues that Plaintiffs want the Court to expand the *Terry* case "beyond its language and rationale, and without legal basis ask this Court to exclude any reference to the fact that future awards are indeed to be expressed by the jury in terms of present value." [DN 186 at 18.] Defendant argues that the holding in that case "only addresses the

narrow issue of whether the jury should have been instructed to reduce its award to present value, not that defendants are to be precluded from cross-examining the plaintiffs' expert on these issues." [*Id.* (citing *Terry*, 655 S.W.2d at 24).] According to Defendant, "[t]he case went on to discuss the concept of 'total off-set' of future inflation and future interest, but the ruling was that the trial court did not commit reversible error in excluding this testimony, not that such testimony could not be admitted." [*Id.*] Defendant also argues that "the court ruled that the jury would be able to determine 'present worth' on its own in part due to cross examination by the party opposing the evidence as noted in the above quotation–cross examination is the precise act that Plaintiffs seek to exclude through this motion." [*Id.*] Defendant also cites to *Winston by Winston v. United States*, in which the Court held that "*Paducah Library* will not be viewed as a constraint by this court on the admission of evidence regarding present worth calculations." 11 F. Supp. 2d 948, 950 (W.D. Ky. 1998).

However, the Court finds our sister district's recent explanation in *Brooks v. Caterpillar Global Mining America, LLC* to be persuasive:

> *Winston* only stands for the proposition that federal courts are not required to be bound by the holding of *Paducah Area Library* since it is a state court decision which could affect procedural matters. In fact, this economic method has long been recognized in Kentucky state and federal courts as reliable. *In re Air Crash at Lexington, Ky.*, 2008 WL 2704159, *2 (E.D. Ky. July 2, 2008); *Eaves v. United States*, 2010 WL 2106651, *4 (W.D. Ky. May 24, 2010). The district court in *In re Air Crash* was faced with a defense motion to exclude opinions of an economic expert utilizing the total offset methodology. The district court held that: "[i]t has been used throughout Kentucky for years and is based on sound logic; it eliminates the bias experts can inject through the use of various discount and inflation rates; and it will save substantial time and reduce the likelihood of jury confusion in this upcoming trial. The Court finds this methodology reliable." *In re Air Crash at Lexington, Ky.*, 2008 WL 2704159, at *2 (E.D. Ky. July 2, 2008). In addition to finding the "total offset" method reliable, the district court excluded evidence of "present value, inflation of discount rates." *Id.*
>
> Further, the United States Supreme Court has recognized the "total offset" methodology as acceptable so long as it is the result of "a deliberate choice, rather

than assuming that it is bound by a rule of state law." *Jones & Laughlin Steel Corp. v. Pfeifer*, 462 U.S. 523, 552-53 (1983). The Court recognizes that it is not bound to follow the total offset method simply because Kentucky courts do. "The admissibility of expert testimony is a matter of federal, rather than state, procedure. Therefore, whether an expert should be permitted to testify is controlled by federal law." *Brooks v. American Broadcasting Companies, Inc.*, 999 F.2d 167, 173 (6th Cir.). See also Amburgey v. United States, 2016 WL 850817, *2 (E.D. Ky. Mar. 2, 2016).

For these reasons, the Defendant's motion to exclude Dr. Smith's calculation of the present value of Plaintiff's future lost wages using the total offset method is denied.

*Brooks v. Caterpillar Glob. Mining Am., LLC*, No. 4:14CV-00022-JHM, 2016 WL 3680861, at *5–6 (W.D. Ky. July 7, 2016). The Court agrees with the *Brooks* court's reasoning and will follow the same logic here. The Court has never tried a case involving future lost wages where the parties had not agreed to use the total offset method and avoid testimony about present value and inflation. Accordingly, Plaintiffs' motion is granted.

## 12) Motion to Preclude the Use of Criminal Case Terminology

Next, Plaintiffs argue "[t]his case is a civil case, not a criminal case. Thus, Defendants should be precluded from using any terms or phrases used in criminal cases, including, but not limited to, the requirement of proof beyond a reasonable doubt, which is not the burden of proof in this case." [DN 173 at 12.] In response, Defendant does not assert that it wishes to use such terms. [*See* DN 186 at 21.] Accordingly, to the extent Plaintiffs wish to preclude use of the phrase "beyond a reasonable doubt," their motion is granted. However, if any other terms or phrases arise at trial which Plaintiffs believe are improper, they can raise that issue at the time.

## 13) Motion to Exclude Any Argument or Testimony Claiming Litigation or the Recovery of Damages Will Drive Up Prices

Plaintiffs also "request that the Court exclude any commentary, questioning, discussion, or reference that litigation or the recovery of damages by Plaintiffs may drive up prices, put

Defendants out of business, cause Defendants to stop doing business in the community, or increase costs. [DN 174 at 12.] In response, "E-Z-GO concurs that arguments that cost of litigation or litigation associated damages are not relevant under FRE Rule 401, subject to the Plaintiffs placing such facts in issue." [DN 186 at 22.] However, "E-Z-GO requests that if the Court grants this motion, that reference by Plaintiffs to any prior litigation or damages award involving or against E-Z-GO be likewise excluded as not relevant under FRE Rule 401 and would be likely to inflame passions and prejudice E-Z-GO without probative value." [*Id.*]

The Court will grant Plaintiffs' motion. However, with regard to Defendant's request that the Court also limit Plaintiffs' reference to "any prior litigation" against E-Z-GO, the Court will not go so far at this time without specific information.[2] Defendant can raise these issues at trial when they arise.

### 14) Motion to Exclude Literature, Treatises, Texts, and the Like on Direct Examination Which Have Not Been Disclosed in Discovery or by the Parties Prior to Trial

Plaintiffs likewise argue that "[a]ll parties should be prohibited from using or referring to any literature that has not been previously disclosed to other parties." [DN 173 at 13.] Plaintiffs further argue that "defense experts should not be permitted to bolster their opinions by making broad statements such as implying that their opinions are supported by the research done by "Dr. X" or at "X University" or "X Institute" if the research has not been fully identified and provided to Plaintiffs." [*Id.* at 13.]

In response, Defendant states "that the Court's pre-trial order set the date for disclosure of all exhibits. However, if a consultant makes an assertion of an opinion or fact otherwise addressed by a reliable, learned treatise, then cross examination as to such fact or opinion with a

---

[2] This being said, absent some convincing arguments, the Court does not see how the amount of any past awards rendered against Defendant would be relevant and admissible at trial.

learned treatise appropriate." [DN 186 at 23.] Because it is not clear if and in what context this issue will arise at trial, the Court will defer its ruling on the issue until that time.

### 15) Motion to Exclude Any Reference to the Notion That Defendants or Their Employees Did Not Intend to Cause Harm to Jordon Jackson

Plaintiffs argue that "[i]ntent to cause harm is not an element of Plaintiffs' claims. Evidence of a purported lack of intent to cause harm is likely to confuse the jury. Further, such evidence is irrelevant and prejudicial and should be excluded under Fed. R. Evid. 401, 402 and 403." [DN 173 at 13.]

In response, Defendant first argues that "[t]estimony regarding care taken by the company during design and manufacture, as well as simple courtesies are not improper. Indeed, they are probative to Plaintiffs' allegations of design defect and should be permitted under FRE 401 and 403." [DN 186 at 23.] Defendant further contends that Plaintiffs' "motion indicates that Plaintiffs intend to argue that E-Z-GO was indifferent to the risk of harm to users, or that E-Z-GO acts only in its self-interest or is not concerned with safety in the use of its vehicles. Kentucky law is clear that such testimony or statements that urge the jury to act on passion and prejudice rather than on the information and evidence introduced at trial is not permitted." [*Id.*]

The Court feels that it has insufficient information to make a decision as to the admissibility of this evidence at this time. In short, the motion is vague. Accordingly, the parties can raise this issue if and when it arises at trial.

### 16) Motion to Exclude Any Reference to or Suggestion That a Recovery of Money Will Not Undo the Injuries and Damages Sustained by Plaintiffs

Finally, Plaintiffs argue that "[i]t is inappropriate for Defendants to argue, refer to, or suggest that a recovery of money will not undo the injuries and damage Plaintiffs have sustained

in an attempt to convince the jury to award damages for less than what is required to fully compensate Plaintiffs for their injuries and other damages." [DN 173 at 14.]

In response, Defendant states that "[w]hether a child or other family member can be 'replaced' through a monetary damages award is as improper for a plaintiff's counsel as it is for any other party to argue. The issue is 'fair comment on the evidence', not emotional bias. The issue is for the jury to determine liability from the evidence, not from the emotion of a lost family member." [DN 186 at 24.] Accordingly, Plaintiffs' motion is granted.

CONCLUSION

For the reasons explained in detail above, **IT IS HEREBY ORDERED AS FOLLOWS**:

(1) Defendant's Motion in Limine to Exclude Spoliation, [DN 165], is **DENIED**.

(2) Defendant's Motion in Limine to Exclude Computer Simulations, [DN 167], is **DENIED**.

(3) Defendant's Motion in Limine to Exclude Patents, [DN 168], is **GRANTED**.

(4) Defendant's Motion in Limine to Exclude Coroner and Scene Photographs, [DN 169], is **DENIED**.

(5) Plaintiffs' Motion in Limine, which includes several smaller motions, [DN 173], is **GRANTED IN PART AND DENIED IN PART** as explained in the above Memorandum Opinion.

(6) Defendant's Motion In Limine to Exclude Other Accidents, [DN 166], remains pending due to further briefing requested by the Court. [*See* DN 197.]

**IT IS SO ORDERED**.

Date:

cc:      Counsel