LORA MADONNA JACKSON, *et al.*,                    PLAINTIFFS

v.

E-Z-GO Division of TEXTRON, INC., *et al.*,                    DEFENDANTS

## MEMORANDUM OPINION AND ORDER

Currently pending before the Court is Defendant E-Z-GO's motion to exclude any references to and all evidence of prior and post-accident unrelated claims and other accidents. [DN 166.] Plaintiffs have responded, [DN 192], and the parties filed supplemental briefing at the Court's request. [*See* DN 201; DN 202; DN 206; DN 207; DN 209; DN 226[1].] Fully briefed, Defendant's motion is ripe for adjudication. For the reasons explained in detail below, Defendant's motion in limine to exclude evidence of prior incidents is **GRANTED IN PART AND DENIED IN PART.** Plaintiffs will be permitted to offer evidence of incident numbers 7, 8, 9, 12, 14, 16, 17, 18, 21, and 23 at trial.

## BACKGROUND

This lawsuit arises out of a rollover accident involving an electric golf cart that led to the tragic death of one of the passengers, fifteen year-old Jordan Kori Jackson, on July 25, 2010 in Grayson County, Kentucky. [*See* DN 1-2 (Complaint).] The golf cart (the "Vehicle") was a 1993 E-Z-GO PC-4X manufactured and sold by Defendant E-Z-GO ("Defendant" or "E-Z-GO"). Jordan Jackson was a passenger in the front right seat of the Vehicle. Three other teenage passengers were also present: Molly Kyle, who was driving, Andrew O'Neill, whose parents

---

[1] Plaintiffs supplemented their Memorandum and Appendix in support of the admissibility of other incidents in DN 226. Before Plaintiffs had done so, the Court already agreed that those two incidents were admissible. Accordingly, the Court does not address DN 226 herein.

owned the Vehicle, and Samantha Compton. Both Andrew O'Neill and Samantha Compton were sitting in the back of the Vehicle at the time of the incident.

Lora Madonna Jackson, Jordan's mother and the administratrix of her estate, and Carmine T. Jackson, administratrix of the estate of Charles T. Jackson Jr., Jordan's father, brought the instant lawsuit against Defendant E-Z-GO Division of Textron, Inc. Herein, Plaintiffs allege that the Vehicle's design was defective, that E-Z-GO failed to provide adequate warnings regarding its safe operation, and that E-Z-GO breached express and implied warranties. [*See* DN 1-2 at 4–7.] Plaintiffs also bring negligence and gross negligence claims against Keith and Dianna O'Neill, Andrew O'Neill's parents, alleging that the O'Neills wrongly allowed their then-underage son and others to operate the Vehicle on the day of the incident. [DN 1-2 at 7–8.] This matter is scheduled for a jury trial beginning on Thursday, August 1, 2018.

DISCUSSION

In their supplemental briefing, Plaintiffs explain that they wish to introduce approximately 47 prior incidents with E-Z-GO vehicles as evidence in the trial of this matter. [*See* DN 201 at 3 (Index of Prior Incidents).] Specifically, Plaintiffs wish to introduce evidence of these prior incidents "as proof of notice and/or defect and/or failures of [E-Z-GO's] required corporate safety program." [DN 202 at 2 (capitalization removed).]

> Plaintiffs urge the Court to allow admission of the proof of other rollovers, other speed-related incidents, and other events that bear enough similarity to some of the facts in this tragic wreck so as to assist the jury in deciding if Textron had notice of use of its product by young teenagers, unlicensed drivers, on slopes, with braking issues and subsequent loss of control, and/or rollover, if one or more of those items constituted a known defect, if Textron intentionally minimized or destroyed evidence of such events, and if Textron's response and lack of response to such events reflects an adequate corporate safety program.

[DN 202 at 22–23.]

The Sixth Circuit has explained that evidence of prior incidents may be offered in products liability cases for multiple reasons, including:

> to (1) prove the existence of a particular defect; (2) prove causation; (3) prove the existence of a dangerous situation at the time of an accident; or (4) prove notice or knowledge of the danger. *McCormick's Handbook of the Law of Evidence* § 200 (2d ed. 1972); 1 D. Louisell, *Federal Evidence* § 98 (1977).

*Koloda v. Gen. Motors Parts Div., Gen. Motors Corp.*, 716 F.2d 373, 375 (6th Cir. 1983). Because there are multiple purposes for which a party may introduce such evidence, the relevance of it "will thus depend not only on the character of the evidence itself but on the purpose for which it is offered." *Id.*

Crucial for purposes of this case, the Sixth Circuit has made clear that "[o]nly prior incidents that are 'substantially similar' to the one at issue will be admissible in evidence. *Surles ex rel. Johnson v. Greyhound Lines, Inc.*, 474 F.3d 288, 297 (6th Cir. 2007) (quoting *Rye v. Black & Decker Mfg. Co.,* 889 F.2d 100, 102 (6th Cir. 1989)). "Incidents which 'occurred under similar circumstances or share the same cause' can properly be deemed substantially similar. The proffering party bears the burden of proof to establish substantial similarity. A showing of substantial similarity insures that the evidence meets the relevancy requirements of Rules 401 and 403." *Id.* (citing *Rye*, 889 F.2d at 102–103) (internal citations omitted). The Sixth Circuit has also indicated, though not expressly accepted or rejected the principle that, "[i]f the prior occurrence is offered to prove notice, however, a lesser degree of similarity is required provided the accident would have tended to warn the defendant." *Bryan v. Emerson Elec. Co.*, 856 F.2d 192 (6th Cir. 1988) (citing *Exum v. General Elec. Co.,* 819 F.2d 1158, 1162-63 (D.C. Cir. 1987)).

Defendant argues that the Court's July 21, 2015 order narrowly defined "[t]he scope of Plaintiffs' claims of defect, and thus the permissible search for claims." [DN 207 at 5.] In that Order, the Court partially granted E-Z-GO's request for a protective order and held that Plaintiffs

could not "[i]nquire about any E-Z-GO incidents not related to rear-wheel-only braking, speed governors, speed retardation, or over-steer technologies." [DN 77 at 7.] In that ruling, the Court explained that Plaintiffs sought:

> evidence to help [them] prove that Textron had notice of the supposed defects that [they] believe[e] contributed to the golf cart accident. In briefing, [they] specifically list[ed] four design features of concern: rear-wheel-only braking as opposed to all-wheel-braking, speed governors, speed retardation devices, and over-steer technology. Thus, only incidents that could have given Textron notice about these supposed problems are relevant to her proving this part of her case, and the Court will fashion its protective order accordingly. Textron need only turn over incident reports and the like that relate to rear-wheel-braking, speed governors and speed retardation devices, and over-steer technology.

[*Id.* at 5 (internal citations omitted).] According to Defendant, however, Plaintiffs' briefing on the issue of prior incidents shows "that they intend to expand the claims of defect at issue in this matter beyond the 'four areas of inquiry' previously identified by the Court and which were further narrowed by Plaintiff's expert proof, and will seek to offer at trial any incident that involves an 'overturn,' or a 'hill', or 'involves minors' without showing the cause of those alleged overturns was the claim of defect in this case." [DN 207 at 7.]

Defendant argues that "Plaintiffs cannot now argue, contrary to their experts' disclosures and testimony, generalized or undefined stability issues or the mere fact that a minor was a passenger to support their claims. They do not assert that the *entire* golf car and utility vehicle industry produces defective vehicles. The fact that a vehicle can overturn on a slope or slide on a wet cart path does not make that vehicle unreasonably dangerous or defective." [*Id.*] Indeed, even Plaintiffs' expert Kristopher Seluga testified that, in certain circumstances, a rollover may occur even though "there was no defect that had anything to do with the accident." [DN 132-6 at 7 (Seluga Deposition).] According to Defendant, "[t]he only other matters that could possibly have

any 'substantial similarity' to the *Jackson* incident would be electric powered, rear-wheel braking only vehicles being operated at speeds above 15 mph while on slopes 10º or less." [DN 207 at 9.]

In *Rye*, the seminal case on the admissibility of prior incidents, the "[a]ppellant was injured when his saw kicked back as he was trimming a narrow piece of wood from a board." *Rye*, 889 F.2d at 102. There, the Sixth Circuit affirmed the district court's exclusion of certain prior incidents from evidence, finding that many of "the prior incidents [did not] contain[] sufficient facts for the District Court to find that the circumstances were substantially similar to those in appellant's case." *Id.* For instance, the district court explained that "a lot of these cases are quite a bit different because they pertain to things like a saw hitting a knot in the wood or the saw cutting somebody's arm or leg *but not really telling us the mechanism of how the injury occurred*." *Id.* (quoting district court's opinion). For other prior incidents, the "complaints merely alleged that the saw kicked back, . . . that the guard was defective, . . . and that Black & Decker failed to warn users of such dangers." *Id.* at 103. According to the Sixth Circuit, "[n]one contained allegations specific enough for the District Court to determine whether they were sufficiently similar to admit at trial." *Id.*

In *Morales v. Am. Honda Motor Co.*, 151 F.3d 500 (6th Cir. 1998), the plaintiff filed suit against Honda after her son sustained severe injuries "as he rode his 1988 Honda Z50R motorcycle into the path of an oncoming pickup truck driven by Helen Graham." *Id.* at 505. There, plaintiff "alleged that Honda defectively designed the motorcycle because its small size combined with the lack of a safety flag gave the motorcycle extremely low visibility." *Id.* On appeal, the Sixth Circuit affirmed the district court's admission of prior incident statistics because "the district court limited the accident statistics at issue to minibikes and small vehicles of the same sort," and therefore that "the 'substantially similar' requirement was met because it may be said that these vehicles perform a similar purpose." *Id.* at 512 (citing *Bittner v. American Honda Co., Inc.,* 533 N.W.2d 476, 484–

85 (Wis. 1995)). The Sixth Circuit emphasized "that this is particularly so where the evidence was used to develop Plaintiffs' age appropriateness argument." *Id.* (citing *Bittner*, 533 N.W.2d at 484–85 ("finding that use of CPSC study comparing three and four wheel ATVs (all-terrain vehicles) was appropriate because these products, though different in design, were intended for a similar purpose and the information was relevant to establishing that Honda may have reasonably designed a safer vehicle")).

In *Surles*, the "[p]laintiff sought to introduce evidence of prior incidents on Defendant's buses to show Defendant had been on notice of incidents likely to lead to the kind of injury suffered by Plaintiff." *Surles*, 474 F.3d at 297. There, the [p]laintiff "suffered injury when Defendant's driver lost control of the bus after being attacked by another passenger on the bus, and after that passenger attempted to take control of the wheel." *Id.* On appeal, the Sixth Circuit affirmed the district court's admission of prior incidents, finding that they "were substantially similar to the October 3, 2001 incident because they involved either passenger interference with the bus driver, or a passenger's attempt to take control of the bus's steering wheel or brakes. Those incidents therefore occurred under 'similar circumstances' or 'share the same cause' as the October 3, 2001 incident." *Id.*

In *Siegel v. Dynamic Cooking Sys., Inc.*, 501 F. App'x 397 (6th Cir. 2012), the plaintiff brought a product liability action against an oven manufacturer after her oven exploded and seriously injured her. [*Id.* at 398–99.] "Experts for both sides agreed that a gas leak in the regulator caused the explosion and that Siegel was not contributorily negligent." *Id.* at 399. In that case, the district court excluded "evidence of other claims involving gas leaks from the same model range. Siegel argued that these incidents showed that gas leakage was a pervasive problem in Dynamic ranges, but offered no evidence that these leaks occurred under conditions substantially similar to

[her] case. She ha[d] not shown, for example, that leaks in the prior incidents originated in the regulator." *Id.* at 405. The Sixth Circuit agreed, and also held that "the district court did not abuse its discretion by excluding evidence of heat complaints because, once again, Siegel did not show similarity—that is, that heat from the kickplates in the other ovens caused a gas leakage or any other damage." *Id.*

Importantly, "[e]ven if there [is] such a showing of substantial similarity . . . the trial judge must 'weigh the dangers of unfairness, confusion, and undue expenditure of time in the trial of collateral issues against the factors favoring admissibility.'" *Rye*, 889 F.2d at 103 (quoting *McKinnon v. Skil Corp.*, 638 F.2d 270, 277 (1st Cir. 1981)). Because "[e]ach item of proffered evidence must be analyzed for the substantial similarity requirement," the Court will address each of the 47 incidents Plaintiffs wish to introduce in turn. *Hayes v. MTD Prod., Inc.*, No. CIV. A. 3:05-CV-781H, 2008 WL 2859223, at *3 (W.D. Ky. July 22, 2008).

## 1. Aleshire, Walter and Leslie, Appendix Ex. 1

Plaintiffs explain that this suit was pending in 1994 and, in a set of interrogatory answers, Defendant identified "eight prior claimants, with law suits ranging back to 1987," including "Babin, John suit filed 6/29/1990," "Balmilero, Dante, suit filed 4/25/1990," "Ballinpley, Jason suit filed 4/4/1994," "Charron, Helene Lavasseur suit filed 6/6/1992," "Griffin, Thomas suit filed 2/13/1987," "Haney, Bradford suit filed 2/7/1994," "Harris, Lanny K. suit filed 4/21/1993," "Sowers, Cynthia suit filed 9/13/1993." [DN 202 at 5–6.] However, Plaintiffs simply state that "No other documents were provided" and do not provide any additional explanation about any of the eight claimants. In Exhibit 1 to the Appendix Plaintiffs filed in support of their memorandum, Plaintiffs only include a document titled "Specially Prepared Interrogatories" in the case *Aleshire v. American Golf Corporation, et. al.* [*See* DN 201-1.] Therein, the plaintiffs in that case requested

information regarding "any legal actions for personal injuries other than the instant action . . . for personal injuries within the past ten years." [*Id.* at 2–3.] In response, E-Z-GO disclosed the names and dates of actions filed by the above eight plaintiffs.

There is no indication, however, what the facts or circumstances of *any* of those eight cases were. As Defendant states in its supplemental brief, the interrogatories served in the *Aleshire* case "addressed 'claims for personal injury' in the preceding 10 years and was not directed to any particular defect or claim facts." [DN 207 at 10.] Defendant further argues that "the interrogatories contain the name and address of plaintiffs' attorney that would have allowed further investigation of the underlying facts needed to meet the Plaintiffs' burden of 'substantial similarity' necessary for admission. Plaintiffs do not report any such contact with the listed counsel for plaintiffs the *Aleshire* case." [*Id.*] The Court agrees, and because Plaintiffs do not provide any other information about the eight cases identified in the discovery responses in the *Aleshire* case, evidence of these lawsuits will be excluded.

## 2. Hoo Han Yoo, Appendix Ex. 2

Plaintiffs also wish to introduce evidence of a prior incident which occurred on April 22, 1990, in which the plaintiff, Hoo Han Yoo, filed suit following a wreck in an E-Z-GO vehicle. In his complaint, Yoo alleged that "[o]n or about April 22, 1990, plaintiff Hoo Hyun Yoo was . . . operating the E-Z-Go Gold Cart incidental to playing golf." [DN 201-2 at 6.] According to Yoo, "the brake on the said golf cart failed to work properly, and plaintiff on account thereof was thrown from said gold cart while operating and driving it over the Fullerton Municipal Golf Course on said date…" [*Id.*] Yoo further alleged that the vehicle "failed to safely slow down and stop and proximately caused plaintiff to sustain the injuries and damages set forth" in the complaint. [*Id.* at 14.] In addition to suing E-Z-GO, Yoo sued the golf course, alleging that it "caused, permitted

and allowed plaintiff to drive and operate the E-Z-GO golf cart on said premises on a downward slope, which resulted in said golf cart's accelerating to a dangerous speed and to tip over, thereby causing plaintiff to suffer the injuries and damages hereinafter described." [*Id.* at 18.]

In the traffic collision report from the wreck, Yoo's statement was that "he was coming down the hill in the golf cart" and "going faster and faster. He tried the brakes but it didn't slow down. At the bottom of the hill, he tried to turn to stay on the path but the cart overturned. It threw him out and the cart landed on top of him. Prior to the incident, he heard strange sounds every time he applied the brakes. He didn't think anything was wrong because the brakes stopped the car before the incident occurred." [*Id.* at 26.] The opinions and conclusions section of the report stated that, though the brakes appeared to be working after the accident, "[i]t seems from the statements [that the vehicle] was going to[o] fast to initiate the turn at the bottom of the hill. Maybe the brakes couldn't stop the cart because of the speed it was traveling. The speed was the cause of the T/c to prevent the [driver] to initiate the turn." [*Id.*]

The Court does not find substantial similarity here. In this case, Plaintiffs allege that the brakes were defective in that they failed to safely stop the vehicle because *applying them caused* yaw instability and the subsequent rollover. In Yoo, by contrast, the allegation was that Yoo "tried the brakes but it didn't slow down." [*Id.* at 26.] This is different from what happened when Molly Kyle was driving the Vehicle in this case. On the whole, the Court cannot say that this incident is substantially similar to the incident in this case.

### 3. Dawn Long, Appendix Ex. 3

Dawn Long brought suit against E-Z-GO and other defendants after she drove an E-Z-GO golf cart which "suddenly and without warning rolled over on its left side as the Plaintiff was making a right hand turn. The golf cart rolled over onto the Plaintiff's legs causing her to be

dragged with the golf cart on top of her lower body." [DN 201-3 at 8.] However, in that case, Long alleged that another defendant, Curtis Tractor Cab Company, Inc., modified the E-Z-Go golf cart by "install[ing] [a] Curtis hardbody cab[] upon it." [*Id.* at 9.] Long alleged that the "E-Z-Go golf cart Model GX-444, with attached metal hardbody Curtis cab, was defective, unsafe, and unreasonably dangerous." [*Id.* at 10.] Long alleged that the golf cart was defective due to "an overly narrow wheelbase proportionate to its center of gravity considering the loads it was expected to carry and the terrain it was expected to traverse." [*Id.*] She also alleged that it was defective because of its "ability to execute a turn too sharply *when the addition of a hardbody cab to the golf cart was made*." [*Id.*] Overall, the Court finds that the circumstances of this accident do not meet the substantially similar standard. There is no allegation of excessive speed, a steep slope, yaw instability, any particular steering input, or any issue with rear-wheel only brakes. As Defendant argues in its response, "[t]he issues presented in the claim arose from an allegation that the installation of the Curtis cab on the gasoline driven vehicle increased height of the center of gravity causing the accident." [DN 207 at 12.] The Court agrees that this incident does not meet the standard for admissibility at trial.

### 4. Phillip Coffelt, Appendix Ex. 4

Plaintiffs state that the Phillip Coffelt "incident occurred on March 1, 1999," however allege that "Textron produced no documents about this event, and provided only the description that an EZ-GO golf cart [ ] rear axle locked up causing car to overturn." [DN 202 at 6–7.] In response, E-Z-GO states that "[t]here is no indication as to the terrain over which it was being operated, or whether the issue was caused by improper braking or maintenance" and "[t]here is no suggestion the vehicle was going faster than 15 mph or that two wheel braking was at issue." [*Id.*] There is also no information suggesting that the vehicle was being operated down a hill. Without

more, the Court cannot say that it has enough information to find that this incident meets the substantially similar threshold. *See Rye*, 889 F.2d at 102 ("None of the prior incidents contained sufficient facts for the District Court to find that the circumstances were substantially similar to those in appellant's case.").

## 5. Sun Country Golf Cars v. EZ-GO, Appendix Ex. 5

With regard to this incident, Plaintiffs explain as follows:

> This incident occurred on August 2, 1999. Textron produced no documents about this event, and provided only the description that the "driver lost control when son slid into him and then brakes grabbed, driver turned steering wheel, lost control, and tipped. Claimed negligent in failing to warn of steepness of grade or turns on cart path." No other documents were provided.

[DN 202 at 7.] In response, Defendant provides somewhat more information:

> This was a third party action, not a direct claim. Driver had his son in the car with him and alleged that the brakes were not functioning. He was trying to negotiate a curve when his son slid and hit his hand from the steering wheel. He lost control while trying to hold his son with one hand and the steering wheel with the other. Allegedly the brakes grabbed, driver turned steering wheel, lost control, and tipped. Driver sustained burns from leaking battery acid.

> Driver alleged that the mechanical brakes failed on the cart and that such failure was due to negligent maintenance by Sun Country Golf Club and also that Revere Dell Webb Golf Club were negligent in failing to warn plaintiff of either the steepness of the grade or the turns on the cart path.

> There is no suggestion the vehicle was going faster than 15 mph or that two wheel braking was an issue.

[DN 207 at 12.]

Here, in contrast to this case, the driver alleges that he lost control as a result of his son hitting his hand from the steering wheel. However, there is no allegation of excessive speed as there is in this case. This is important because Plaintiffs' expert, Kristopher Seluga, opines that the accident at issue in this case would not have occurred if the Vehicle has been going 15 miles per hour or less. [DN 113-1 at 22.] Further, there is no allegation of defective rear-wheel brakes, which

Seluga also opines the accident would not have occurred without. [*Id.* at 21.] Accordingly, the Court agrees that Plaintiffs have not shown this incident to be substantially similar to the circumstances of this case.

### 6. Illich, Wilma et al v. EZ-GO, Appendix Ex. 6

For the next incident, Plaintiffs state:

> This incident occurred on May 19, 2000. Textron produced no documents about this event, and provided only the description "driving down a very steep hill, lost control, striking a tree, thrown from vehicle '(file destroyed)' ." No other documents were provided.

[DN 202 at 7.] In response, E-Z-GO argues that this incident also is not substantially similar because "[t]here is no reference to brake application" and "[t]here is no suggestion the vehicle was going faster than 15 mph or that two wheel braking was an issue." [DN 207 at 13.] The Court agrees and finds that Plaintiffs have not made the requisite showing to find substantial similarity. There is simply not enough information to find the standard satisfied here.

### 7. Davis, Russell adv. EZ-GO, Appendix Ex. 7

Plaintiffs explain this incident as follows:

> This incident occurred on June 12, 2000. Textron produced no documents about this event, and provided only the description "brake malfunction on fully loaded beverage car going down a sharp hill wet with rain when brakes locked up and the vehicle skidded into a bank." No other documents were provided.

[DN 202 at 7.] Defendant again argues that, "[t]here is no suggestion the vehicle was going faster than 15 mph or that two wheel braking was an issue." [DN 207 at 13.] However, the Court finds the facts that the "brakes locked up" while traveling down a "sharp hill," which caused the vehicle to "skid," is sufficient to find that this incident "occurred under similar circumstances" as the incident in this case. S*urles*, 474 F.3d at 297 (citing *Rye*, 889 F.2d at 102–103). Similarly, in this

case, Molly Kyle testified that she "locked the brake" and the Vehicle "just . . . went out of control." [DN 131-4 at 9.] Therefore, this incident is admissible.

**8. Nelson, Donald, Appendix Ex. 8**

Plaintiffs state: "This incident occurred on July 4, 2000. The only reference is a mention in the *Valente* interrogatories, 'Car overturned while negotiating a slight right turn on downhill grade.'" [DN 202 at 8 (citing DN 201-17).] In response, Defendant states that "[t]he particular interrogatory produced in discovery disclosed claims in which the[re] was an assertion of an accident that occurred 'due to a claimed brake failure,'" however that "[t]here is no suggestion in the interrogatory answer that the vehicle had been going faster than 15 mph or that two wheel braking was an issue." [DN 207 at 14.]

Though it is not apparent whether the vehicle at issue in the Nelson incident had rear-wheel brakes, the fact that the defect was an alleged "brake failure" suggests that the brakes *were* applied in that incident. This, combined with the facts that the vehicle made a right turn (a steering input) on a downhill grade, which led to an overturn, is sufficient for the substantially similar standard. Specifically, the Court finds that there is sufficient information to say that this incident "occurred under similar circumstances" as the incident in this case. S*urles*, 474 F.3d at 297 (citing *Rye*, 889 F.2d at 102–103). This incident is admissible in evidence.

**9. Creech, William B. v. EZ-GO, Appendix Ex. 9**

In their memorandum, Plaintiffs explain:

> This incident occurred on August 7, 2000. Textron produced no documents about this event, and provided only the description "sole occupant and alleged that the brakes on the golf car he was operating locked up causing him to lose control of the [golf car] which turned suddenly and overturned." No other documents were provided.

[DN 202 at 8.] In response, Defendant argues "[t]here is no suggestion the vehicle was going faster than 15 mph or that two wheel braking was an issue." [DN 207 at 14.] Again, however, the Court finds that it is enough for substantial similarity that the brakes in the Creech incident "locked up," which suggests they were applied, and that this caused a loss of control, a sudden turn, and a rollover. This is sufficiently similar to find that the Creech incident "occurred under similar circumstances" as the incident in this case. S*urles*, 474 F.3d at 297 (citing *Rye*, 889 F.2d at 102–103). This incident is admissible in evidence.

### 10. Carpenter, Heath & Jack v. EZ-GO, Appendix Ex. 10

Plaintiffs state that "[t]his incident occurred on July 5, 2001. It involves a similar high rate of speed obtained as the cart was on a downhill grade, causing the driver to lose control. No other documents were provided." [DN 202 at 8.] In response, Defendant further explains that, "[r]eportedly, Mr. Carpenter and his son were driving down a hill at a very high rate of speed, lost control and ran into a tree." [DN 207 at 15.] However, Defendant argues that "[t]here is no suggestion the vehicle was going faster than 15 mph . . . nor was there any indication that two wheel braking was an issue, since the vehicle struck a tree." [*Id.*] Indeed, there are no facts to suggest that brakes were applied, locked up, or contributed to the accident at all in the Carpenter incident, as there are in this case, nor is there an allegation that the Carpenter incident resulted in a rollover. Though this incident involved a "high rate of speed," the Court finds that this, without more, is insufficient to find that this incident "occurred under similar circumstances or share[s] the same cause" as the incident in this case. S*urles*, 474 F.3d at 297 (citing *Rye*, 889 F.2d at 102–103).

### 11. Campbell, James, Appendix Ex. 11

"This incident occurred on October 12, 2001. Textron describes this event in its Attachment 37-6 (Exhibit 53), as 'brakes applied on a downslope on golf course, claims rear wheels locked,

vehicle lurched and occupant fell from vehicle.'" [DN 202 at 8.] In his complaint, Campbell

alleged that the golf cart's "brakes were defective" such that "the brakes locked [and] the cart went

into a 360 degree spin and plaintiff was thrown from the cart." [DN 201-11 at 6.]

In response, Defendant first states that "[t]here is no suggestion the vehicle was going faster

than 15 mph or that two wheel braking was an issue." [DN 207 at 16.] Defendant further points

out that, "[a]ctually, the Attachment # 37-6 provided by E-Z-GO in discovery identified the vehicle

as a '1999 TXT DCS' golf vehicle. ***The 'DCS' designation means the vehicle was equipped with***

***regenerative braking as part of its original manufacture***." [*Id.* (citing James Fisher, depo. p. 94).]

Because Plaintiffs' expert opines that, in this case, "[i]f the car had been equipped with a speed

limiting device that adequately controlled the vehicle's speed which reveling downhill (e.g.

regenerative brakes), the brake-induced yaw instability and subsequent rollover would have been

avoided." [DN 113-1 at 22.] Here, since the incident involved in the Campbell matter *did* have

regenerative braking, the Court cannot see how that incident can be relevant to demonstrate a

defect with the Vehicle involved in this case. The fact that the regenerative braking constitutes an

entirely different braking design than the mechanical braking on the PC-4X Vehicle involved in

this case is also significant. *See Anderson v. Whittaker Corp.*, 894 F.2d 804, 813 (6th Cir. 1990)

("Substantial similarity existed in that the [prior] incidents to which the boat owners testified

involved the *same model boat, the same hull design, the same defect*, and a water intake occurring

under circumstances similar in important respects to those present when the Sea Mar

disappeared.") (emphasis added). Accordingly, the Court will exclude this incident from evidence.

## 12. Crawford, Timothy, Appendix Ex. 12

Plaintiffs argue that the Crawford incident is "amazingly similar." [DN 202 at 8.]

It occurred on August 9, 2002. The summaries at Ex. 12 that best explain the facts
are the F.A.C.E. article and the NIOSH investigation, which among its other

findings recommended that no one under the age of 16 be allowed to drive gold carts, *and* that Textron place a label prominently so warning."

[*Id.* at 8–9.] The Kentucky Fatality Assessment and Control Evaluation Project ("FACE") article summarizes the facts as follows: "A fifteen-year-old golf course worker (the victim) was killed when the utility golf cart he was operating overturned." [DN 201-12 at 13.] As the victim and his friend were traveling on separate golf carts, they

> traveled downhill via public and golf course roadways, towards the clubhouse. As they descended the hill, they were reportedly racing when the victim lost control of his cart; it left the roadway and struck a pile of dirt. The vehicle became airborne over a small creek, rotated in the air, throwing the victim from the cart. The victim landed on his head on the opposite side of the creek.

[*Id.*] "The investigating officer calculated the victim was reveling 28.15 mph." [*Id.* at 14.] "According to the sherriff's report, the victim's friend saw the victim's cart 'fishtail, leave the roadway, cross the grass and become airborne.' At that point the friend applied his brakes, went sideways and toppled his own cart." [*Id.*]

"In order to prevent similar instances from occurring, FACE investigators recommend[ed] that:" 1) "workers under the age of 16 should not operate motorized machines;" 2) "utility golf carts should be equipped with seat belts and rollover protection structures;" 3) "a warning label should be posted, in a highly visible location, stating that no one under 16 years of age should operate the vehicle." [*Id.* at 13.]

In response, Defendant states that "[a] claim of regenerative braking was present in that action," however, "[n]o claims of two wheel braking or four wheel braking were made in the case." [DN 207.] Here, however, the Court finds that enough information exists to find substantial similarity. Though there was no specific claim of defective two-wheel braking in the Crawford case, there was a claim that regenerative braking should have been present on the 1995 E-Z-Go XT-500 utility vehicle. Additionally, the investigation revealed that the vehicle was likely

traveling about 28.15 mph, similar to the allegations in this case. Moreover, this incident also involved a minor traveling down a hill and reportedly involved fishtailing. [DN 201-12 at 14.] Further, the victim's friend in Crawford reportedly "applied his brakes, went sideways, and toppled his own cart," which is also similar to the allegations in this case. Overall, the Court finds that Plaintiffs have shown enough similarities between this incident and the instant case to find that the incidents "occurred under similar circumstances or share the same cause." S*urles*, 474 F.3d at 297 (citing *Rye*, 889 F.2d at 102–103). Accordingly, this is admissible as a prior incident.

**13. Olsson, Laurie Olsson – Jones and Ray Olsson, Appendix Ex. 13**

The complaint in this matter states that, on August 8, 2001, "Laurie Olsson-Jones was driving a golf cart down the incline of a hill at Wild Creek Gold Course. Olson-Jones' father, Ray Olson, was a passenger in the golf cart. The golf cart [malfunctioned and] tipped over, and both Plaintiffs sustained severe injuries and damages." [DN 201-13 at 3, 5.] However, there is no additional information regarding the braking or speed involved in this incident. Without more, the Court cannot say that this incident is substantially similar to the facts of this case. *See Rye*, 889 F.2d at 102 ("None of the prior incidents contained sufficient facts for the District Court to find that the circumstances were substantially similar to those in appellant's case.").

**14. Rufra, Troy & Janell, Appendix Ex. 14**

> This incident happened on May 9, 2003. Textron describes it as a case that settled, and involved "passenger in golf cart that rolled over while descending a hill. Allegations focused on lack of warning on the course about the steepness of the grade of the path which created a hazardous condition for the driver of the golf cart."

[DN 202 at 9.] The complaint in this matter states that, "[w]hile descending a hill on the defendant's golf course, the golf cart in which the plaintiff, Troy Rufra, was a passenger, rolled over causing the plaintiff to suffer severe, painful and permanent injuries . . . " [DN 201-14 at 5.]

Therein, plaintiffs claimed that "Defendant Glenmary Country Club substantially caused the incident and plaintiffs' injuries and damages due to its golf cart path, which was unreasonably dangerous." [*Id.* at 6.] Plaintiffs further claimed that the Country Club failed "to properly and safely service, maintain, and/or repair the golf cart." [*Id.*] For their claims against E-Z-GO Textron, Plaintiffs alleged that "[t]he cart was not designed with *adequate brakes*, suspension, steering, and weight distribution *to prevent roll-over type accidents*, like the one in which Troy Rufra was injured. Textron . . . is aware of golf cart paths like the one at issue herein that present turns while descending a steep hill." [*Id.* at 15 (emphasis added).]

In response, Defendant argues that "[t]here is no suggestion in the interrogatory answer or in the complaint provided that the vehicle had been going faster than 15 mph or that two wheel braking was an issue." [DN 207 at 18.] However, the fact that the plaintiffs in the Rufra incident alleged that the golf card had "inadequate brakes" to prevent rollover accidents suggests that the brakes *were* applied in this incident. This, combined with the facts that the vehicle was descending a hill and rolled over, is sufficient for a finding of substantial similarity.

### 15. May, Michael, Appendix Ex. 15

"This incident happened on November 1, 2004. Teenager killed after golf cart in which he was riding tipped over." [DN 202 at 9.] The only available documents from which to glean the facts of this incident are from news articles. [*See* DN 201-15.] One newspaper article states:

> Michael May, 14, of Lake Zurich, was helping at a concession stand Saturday during a Lake Zurich Flames football game when he was killed after the golf cart he was riding in flipped over . . . Michael was in the passenger's seat of the golf cart and a 14-year old Lake Zurich girl was driving the golf cart . . . Michael and the girl were having mechanical problems with the cart before the accident . . . "It appears they couldn't get it started at first . . . When it did start, the wheels took off, and it flipped over."

[DN 201-15 at 2.] In response, Defendant argues that this incident is not substantially similar to the facts of this case because "[t]here is no suggestion in the news article provided that the vehicle had been going faster than 15 mph or that two wheel braking was an issue. The article suggests the vehicle may have been gasoline powered with the difficulty with starting." [DN 207 at 19.] The Court agrees that the mere fact that the vehicle flipped over is not enough for substantial similarity. Additionally, the fact that there was evidence of mechanical issues with the May vehicle *before* the teenagers even began driving it distinguishes this incident from the case at hand. In May, the article reported that once the vehicle was started, it "took off, and it flipped over." These circumstances are not similar to those that occurred in this case. Accordingly, the Court finds that Plaintiffs have not made the requisite showing of substantial similarity.

### 16. Miner, Michael, Appendix Ex. 16

"This incident happened on May 14, 2005. Textron describes it as a case that 'alleges that brakes did not operate properly on the golf cart, car slid onto a wet wooden bridge and rolled over onto him.'" [DN 202 at 9.] In the complaint, plaintiff Michael Miner alleged that he "was operating Defendant's golf cart between the 16th and 17th hole at The Chief Golf Course when the brakes did not operate properly allowing the golf cart to slide onto a wet and dangerous wooden bridge causing it to roll over onto Plaintiff." [DN 201-16 at 8.] Miner was allegedly "operating a golf cart down hill on a wet wooden bridge and the brakes [were] not functioning properly." [*Id.*] Miner alleged, in part, that the dangerous condition was "allowing slippery condition to be maintained on the premises without warning." [*Id.* at 9.] As to Defendant Textron, however, Miner alleged that it "provided Plaintiff with golf cart that had brakes that would lock up while Plaintiff was attempting to operate the golf cart down a wet hi[ll] onto slippery wooden bridge." [*Id.* at 12.]

The Court finds that Plaintiffs have shown substantial similarity with regard to the Miner incident. Though this incident involved a wet surface, which is not alleged in this case, the facts that the brakes "locked up" as Miner was operating the cart down a hill, which then caused it to "slide" and roll over, is sufficient to say that this incident "occurred under similar circumstances" as the incident in this case. S*urles*, 474 F.3d at 297 (citing *Rye*, 889 F.2d at 102–103). Any differences Defendant alleges between this incident and the facts of this case can be brought out on cross-examination.

### 17. Valente, Matthew and James, Appendix Ex. 17

"This incident happened on August 18, 2007. The areas of similarity are best exemplified by Textron's own description in its database (Ex. 53), Textron describes it as a case that 'driving down a steep hill, hit brakes and overturned.'" [DN 202 at 10.] In *Valente*, "Plaintiffs allege[d] that the golf car at issue was defectively designed because it only had a rear-wheel braking system and did not have a seatbelt restraint system." [DN 201-17 at 32.] According to Matthew Valente, as he was driving an E-Z-GO golf car on the path to the 10th hole of a golf course where he worked, "the path turned slightly to the left," so he "turn[ed] the steering wheel slightly 'to maintain a straight course on the path.'" [*Id.* at 33–34.] Valente stated that he "simply applied the brakes, and the golf cart yawed, or fishtailed" and it "rolled over onto its passenger side." [*Id.* at 34.]

The Court realizes, as Defendant points out in its response, that this case was filed "in the United States District Court for the Eastern District of New York [and, therein,] the Plaintiffs' consultant Seluga raised claims of 'rear wheel braking' instability." [DN 207 at 21.] In that case, "Mr. Seluga's opinions were excluded as unreliable, and the matter was dismissed." [*Id.*] Nonetheless, Valente alleged, as do the Plaintiffs in this case, the applying the brakes caused the golf cart to yaw and roll over. The Court finds that this is sufficient for a finding of substantial

similarity. Whether the plaintiffs in *Valente* were successful in their lawsuit is irrelevant to whether Defendant had notice of certain types of accidents which occurred in its vehicles.

### 18. DeLisle, Dave, Appendix Ex. 18

"This incident happened on January 22, 2008. He was coming downhill as cart picked up speed, pumped brakes but would not stop cart safely. Occupant fell from cart and sustained injury." [DN 202 at 10.] In an email to Defendant's then-legal counsel, John Rupp, Dave DeLisle stated:

> On the day of the incident, July 10th, 2007, as I was coming down the hill on hole number 7 at Meadowcreek golf course in Dracut Ma., the E-Z-Go golf cart began to pick-up an extreme amount of speed. I removed by foot from the accelerator pedal and I carefully, and repeatedly, pumped the brake pedal. This tact did not slow the cart down, it actually picked up speed. I then pushed the brake pedal with continuous pressure and the cart did a 360 degree rotation and sped up. I continued down the hill in the cart at a dangerous rate of speed, nothing I tried stopped the cart safely. Shortly thereafter, I fell from the cart and sustained serious injury that affects me today.

[DN 201-18 at 3.] In response, Defendant argues that "Plaintiffs make no showing of how brakes not working to slow a vehicle would be substantially similar to the *Jackson* claims." [DN 207 at 21.] However, the Court believes it is significant that, in this incident, after DeLisle pressed the brake pedal, "the cart did a 360 degree rotation and sped up." This is similar to the circumstances alleged in this case, in which Molly Kyle testified that, once she "locked the brake," the vehicle "went out of control." [DN 131-4 at 9.] This is sufficient for a finding that this incident "occurred under similar circumstances" as the accident in this case. S*urles*, 474 F.3d at 297 (citing *Rye*, 889 F.2d at 102–103).

### 19. Rose, Larry, Appendix Ex. 19

"This incident happened on October 1, 2008. Rose was hurt when his cart overturned while he was going down a 'steep and winding' cart path on the Tee-Bird course in Fort Edward, Washington County. Rose insisted he was driving 'slowly and cautiously' when the accident

occurred." [DN 202 at 10.] The only document available to expand upon the facts of this incident is an article from New York Law Journal dated April 11, 2014 and titled "Panel Allows Lawsuit Over Golf Cart Accident." [DN 201-19 at 2.] Therein, the author wrote "A golfer who was injured when he cart flipped over while he drove down a slippery slope may sue course operators, an upstate appeals court decided Thursday." [*Id.*] The author explained:

> Larry Rose said he was hurt in October 2008 when he cart overturned while he was going down a "steep and winding" cart path on the Tee-Bird course in Ford Edward, Washington County, that he had never played on before. Rose insisted he was driving "slowly and cautiously" when the accident occurred.

[*Id.*] In response, Defendant states "Plaintiffs fail to inform the Court that the manufacturer and type of golf car are unknown, the subject golf car was not been alleged to have been an E-Z-GO product, and the Appellate Division held that the  triable issue of fact was **whether the vehicle had bald tires at the time of the accident**." [DN 207 at 22.] Additionally, Defendants argue that, in the Rose case, "[n]o allegations of defect were ever alleged. Therefore Plaintiffs have not shown that an E-Z-GO product was involved, that the grade of the hill, the speed of the vehicle at the time of incident, or that any allegations of rear-wheel only brake induced instability were asserted in this incident." [*Id.*] Defendant stresses that "[t]he Rose Plaintiffs established that the cause of this accident may have been a **failure to maintain the tires on the golf car**, as recognized by the New York Appellate Division." [*Id.*] Because the Rose incident does not include any facts relating to over speed, yaw instability, or two-wheel brakes, the Court agrees that Plaintiffs have not shown substantial similarity.

**20. Page, Robert and Yun Young, Appendix Ex. 20**

Plaintiffs explain that "[t]he deposition provided at Ex. 20 is the only document Textron produced from this case. It was taken on August 14, 2009, and deals with TeamConnect, document retention and after-market systems." [DN 202 at 10.] Plaintiffs attached a 70 page deposition but

do not point the Court to any particular page. [*See* DN 201-20.] In its response, Defendant cites to page 51 of the deposition for the proposition that the claim in the underlying case dealt with "the possible danger of a rear-facing passengers to fall out of the vehicle." [DN 201-20 at 15, depo. page 51.] So far as the Court can tell, Defendant is correct that "[t]here is no suggestion . . . that the vehicle had been going faster than 15 mph or that two wheel braking was an issue." [DN 207 at 22.] Accordingly, the Court does not find that substantial similarity has been established here. The Court has dealt with the admissibility of this evidence as it relates to Defendant's corporate safety program in other orders.

## 21. Mense, Bernhard and Rita, Appendix Ex. 21

"This incident happened on September 4, 2009. The description provided by Textron from its database states 'Claimants attempted to apply brakes on a small hill, brakes locked and golf cart tipped over causing injury to both claimants. Settled against Textron.'" [DN 202 at 11.] In the letter from the golf course's insurer to Textron, the insurer stated "Mr. & Mrs. Mense, while driving an EZGO cart at the Mill Run Golf & Country Club attempted to apply the brakes on a small hill when the brakes locked, due to a known issue with the operating system, and the cart tipped over causing injury to both members." [DN 201-21 at 3.] The Court agrees that the circumstances of this incident are sufficiently similar to the incident in this case. Like the incident that is the subject of this case, the Mense incident involved driving down a hill, hitting brakes, and the golf cart tipping over. Though there is no information as to speed or yaw instability, Plaintiffs have nonetheless met their burden of demonstrating that the Mense incident "occurred under similar circumstances" as the incident in this case. *See* S*urles*, 474 F.3d at 297 (citing *Rye*, 889 F.2d at 102–103).

**22. Kohut, Mark, Appendix Ex. 22**

"This incident happened on June 14, 2010. The description provided by Textron from its database states 'golf car operated on hill, driver applied and locked brakes. Vehicle continued to increase speed; driver turned and hit wood rail.'" [DN 202 at 11.] The "statement form" from the incident states that, per an interview with Mark Kohut, as he

> started down the hill [he] noticed it was quite steep and he hit the brake too hard locking it. Not knowing what to do, he hit the gas pedal to release brake making cart to speed up. The cart was heading left so he turned right, and next thing he knew the tire hit the wood rail sending him and cart airborne and land on its side pinning him underneath.

[DN 201-22 at 2.] The person who took Kohut's statement wrote "I asked him was he drinking he said yes a few beers." [*Id.*]

In response, Defendant again argues that "[t]here is no suggestion the vehicle was going faster than 15 mph or that two wheel braking was an issue" and additionally that "the Attachment # 37-6 provided by E-Z-GO in discovery identified the vehicle as a '2007 TXT PDS' golf vehicle. *The 'PDS' designation means the vehicle was equipped with regenerative braking as part of its original manufacture*." [DN 207 at 23.] Here, there is no allegation of overspeed or that pressing on the brakes caused yaw instability that caused a rollover. Rather, the report states that after Kohut pressed on the accelerator and turned right, "the tire hit the wood rail sending him and cart airborne and land on its side." Additionally, as the Court noted above, the fact that the vehicle involved in the Kohut incident was equipped with regenerative braking, which constitutes an entirely different braking design than the mechanical braking on the PC-4X Vehicle in this case, is also significant. *See Anderson*, 894 F.2d at 813 ("Substantial similarity existed in that the [prior] incidents to which the boat owners testified involved the *same model boat, the same hull design, the same defect*, and a water intake occurring under circumstances similar in important respects to those present when

the Sea Mar disappeared.") (emphasis added). In sum, the Court does not find the substantial similarity standard satisfied here.

### 23. Camila Andrea Pineda Mafuz, Appendix Ex. 23

> Camila Mafuz, a minor, and her parents, Suzette Mafuz and Adalberto Pineda Pantojas, filed a complaint in the United States District Court for the District of Puerto Rico. According to the complaint, on May 30, 2010 (approximately 2 months before the subject incident occurred), Camila Mafuz was a front seat passenger in a golf car that was being driven down a slope of a residential street in Humacao, Puerto Rico. As the golf car was being driven downhill, a left turn was made at which time the golf car rolled over and fell on top of Camilla, who was 16 years old at the time, and crushed her against the pavement. Camila suffered severe and permanent physical damages and emotional distress and anguish as a result of the rollover.

[DN 202 at 11.] Plaintiffs further alleged that E-Z-Go was liable for "failing to provide adequate and complete instructions on the use of the Golf Cart, particularly as they pertain to turning while driving and/or braking while traveling down a slope." [DN 201-23 at 5.] Additionally, they alleged that E-Z-Go was liable for "failing to equip and install brakes on all four wheels of the Golf Cart." [*Id.*]

The Court finds that this incident is also sufficiently similar to meet the standard for admissibility. Here, the vehicle was being driven down a hill, and, after making a left turn (steering input), the vehicle rolled over. Though there is no information as to speed, the fact that the allegations of defect included failure to warn regarding "*braking* while traveling down a slope" and "failure to . . . install brakes on all four wheels" suggests that the brakes were applied in this incident. Taking all of these factors into consideration, the Court agrees that Plaintiffs have shown that this incident "occurred under similar circumstances" as the incident in this case. S*urles*, 474 F.3d at 297 (citing *Rye*, 889 F.2d at 102–103).

### 24. Page, Greg, Appendix Ex. 24

> This incident happened on [March 30, 2012].[2] The description provided by Textron from its database states "Electric cart descending hill that had turn in it. Cart path was damp" at the time. The brakes on cart allegedly locked up while going downhill, and occupant jumped from overturning golf car." No other documents were provided.

[DN 202 at 12.] In response, Defendant argues that "Plaintiffs have not shown the grade of the hill allegedly involved, the speed of the vehicle at the time of the incident, or that any allegations of rear-wheel only brake induced instability were asserted in this incident." [DN 207 at 24.] Further, Defendant states that "the vehicle involved, an RXV, equipped with an electronic braking system and regenerative brakes and is not substantially similar to the 1993 PC-4X with rear-wheel mechanical brakes as involved in this litigation." [*Id.*] The Court agrees that the differences between the types of vehicles defeats the substantial similarity standard for this incident. The two incidents involved vehicles with completely different braking designs. *See Anderson*, 894 F.2d at 813 ("Substantial similarity existed in that the [prior] incidents to which the boat owners testified involved the *same model boat, the same hull design, the same defect*, and a water intake occurring under circumstances similar in important respects to those present when the Sea Mar disappeared.") (emphasis added). Additionally, there is no allegation of overspeed or yaw instability, and it does not appear that any additional facts are available.

### 25. Thornton, Kyle, Appendix Ex. 25

"This incident happened on July 14, 2012. Driver made left turn while driving downhill. Golf cart rolled over killing 16 year old." [DN 202 at 12.] The incident report Plaintiffs included in their appendix states "Car was going down hill on winding cart path and turned over." [DN 201-25 at 4.] In response, Defendant clarified that "this incident did not result in a death;" rather, the

---

[2] It appears Plaintiffs inadvertently stated the date of this incident was august 14, 2009.

incident report states that the injury "was a broken arm and road rash." [DN 207 at 24; DN 201-25 at 4.] Defendant further argues that "Plaintiffs have not shown the grade of the hill, the speed of the vehicle at the time of the incident, or that any allegations of rear-wheel only brake induced instability were asserted in this incident." [DN 207 at 4.] The Court agrees. There is no information available regarding speed or brake application at all for this incident or suggesting that similar rear-wheel brakes were on the vehicle. The Court finds that the substantial similarity standard is not satisfied here.

### 26. Cunning, Don and Jody, Appendix Ex. 26

> On July 18, 2012, Don and Jody Cunning were injured as a result of a golf car rollover at Scott Lake Country Club. The golf car was travelling downhill when it swerved to the right and rolled over. As a result of the incident, Don Cunning had possible broken ribs and a leg injury, and Jody Cunning complained of rib pain. An E-Z-GO Incident Report, a news report, another Incident Report, and several invoices concerning golf cars at Scott Lake Country Club are attached at Appendix, Exhibit 26. This incident is substantially similar to the subject incident because it involves a similar E-Z-GO golf car that rolled over while traveling downhill after a steering input was made.

[DN 202 at 13.] Defendants make many arguments in response:

> This incident involves a **gasoline** engine rather than an electric motor as involved in this litigation . . . The Scott Lake County Club test indicated a maintenance issue, and the driver's brake cable was replaced.

> At no place in the attached documents is there a statement indicating this incident occurred "after a steering input was made" as stated by Plaintiffs . . . Nor, contrary to Plaintiffs' statement . . . is this 2010 gasoline powered golf car a "similar" vehicle to the 1993 PC-4X involved in this litigation.

> Plaintiffs have not shown the grade of the hill, the speed of the vehicle at the time of incident, or that any allegations of rear-wheel only brake induced instability were asserted in this incident.

[DN 207 at 25.] It is significant that "[t]he Scott Lake County Club test indicated a maintenance issue, and the driver's brake cable was replaced" because this indicates that there was an issue with the brake cable rather than a defect stemming from rear-wheel brakes. Additionally, there is no

allegation of overspeed. Finally, the incident report states that the car "swerved to the right" as it was going downhill "and tipped over," but does not indicate how the swerve occurred. [DN 201-26 at 4.] The Court agrees that this, combined with the difference between the 2010 gasoline-powered golf car and the 1993 PC-4X in this case, defeats a finding of substantial similarity.

## 27. Jack David Segust, Appendix Ex. 27

"This incident happened on August 9, 2012. A rugby player killed when golf cart plunged down embankment and hit a tree on August 9, 2012. Two news articles and an email thread between Jim Fisher (EZGO) and Tim Lansdell are attached at Appendix, Exhibit 27." [DN 202 at 13.] One news article states that Segust was killed "when the golf buggy he was travelling in [suddenly] plunged down an embankment and hit a tree." [DN 201-27.] However, there is simply no information available about the circumstances of this incident. There is no indication of whether overspeed, rear-wheel braking, or yaw instability were present. Without more information, the Court cannot say that the substantial similarity standard is met here.

## 28. Hayley Lam, Appendix Ex. 28

On November 4, 2012, Hubert Lam and his nine-year-old daughter, Haley Lam, were traveling downhill on an E-Z-GO electric golf car at La Cañada Flintridge Country Club in La Cañada Flintridge, California. Haley was driving the golf car. As a result of the rollover, Haley fractured her femur and was taken to the hospital for surgery. Textron was notified of the incident and investigated the incident. As part of its Incident Report, Textron noted that the golf car involved in the incident did not have any mechanical failures and still ran properly after the incident. In particular, Textron's Incident Report confirms that the golf car was able to be stopped and steered after the incident. In addition to the Incident Report, the country club obtained six witness statements. The Incident Report, witness statement, and photographs of the golf car involved in the incident are attached at Appendix, Exhibit 28. This incident is substantially similar to the subject incident because it involves a similar electric E-Z-GO golf car that was traveling downhill and rolled over. The incident also is substantially similar to the subject incident because the golf car was being operated by a minor at the time of the rollover.

[DN 202 at 13–14.] Though this incident involved a rollover which occurred after travelling downhill, there is no information about the speed of the golf car, whether the brakes were rear-wheel only, whether the brakes were applied immediately before the rollover, or whether there was any yaw instability. The mere fact that the golf car was "travelling downhill and rolled over" is insufficient to show substantial similarity. Additionally, Defendant points out that "the vehicle involved, an RXV, *is equipped with regenerative brakes* and is not substantially similar to the 1993 PC-4X with rear-wheel mechanical brakes as involved in this litigation." [DN 207 at 26 (emphasis added).] The difference in braking design distinguishes the two vehicles. *See Anderson*, 894 F.2d at 813 ("Substantial similarity existed in that the [prior] incidents to which the boat owners testified involved the *same model boat, the same hull design, the same defect*, and a water intake occurring under circumstances similar in important respects to those present when the Sea Mar disappeared.") (emphasis added). The Court agrees that the requisite substantial similarity has not been shown for this incident.

### 29. Golf Cart Overturned, Child Injured, Appendix Ex. 29

> On February 15, 2013, three golf cars were involved in the crash. One of the golf cars overturned during the crash. Two news articles and an email from Jim Fisher (EZGO) to "Chief McDonald" are attached at Appendix, Exhibit 29. This incident is substantially similar to the subject incident because it involves the overturning of a golf car, and minors were involved in the incident.

[DN 202 at 14.] In response, Defendant argues that this "was a traffic accident rather than an incident involving slope or hill." [DN 207 at 26.] Additionally, Defendant states that "[n]one of the manufacturers are known, and Plaintiffs cannot establish that an E-Z-GO vehicle was involved in this traffic accident, much less that an E-Z-GO vehicle was the vehicle that was overturned as a result of the multi-vehicle collision." [*Id.*] According to Defendant:

> Plaintiffs have not shown that any hill was involved, much less the grade of the hill, the speed of the vehicles at the time of incident, or that any allegations of rear-wheel only brake induced instability were asserted in this incident.
>
> Plaintiffs' sole argument of 'substantial similarity' is that minors are involved and a golf car was somehow overturned.

[*Id.*] The Court agrees. There is simply not enough information to find that this incident is substantially similar to the facts of this case.

### 30. Golf Cart Flipped Going Down Hill, Mother of Kurt/Kyle Busch, Appendix Ex. 30

> On March 2, 2013, Gaye Busch, the mother of NASCAR drivers Kyle and Kurt Busch, was injured when the golf car she was riding rolled over. At the time of the rollover, the golf car was travelling downhill. The driver lost control of the vehicle, and it rolled over. A document containing two news reports about the incident is attached at Appendix, Exhibit 30. This incident is substantially similar to the subject incident because it the driver lost control while travelling downhill and then the golf car rolled over.

[DN 202 at 14–15.] One attached news article states "the driver came down a hill and lost control, flipping the cart and injuring five people in the process." [DN 201-30 at 2.] Another attached article states that the local fire chief "said the golf-cart driver was *not* speeding at the time of the accident." [*Id.*] In response, Defendant further argues that its records "clearly show[ ] that an unknown person converted a fleet golf car (reported but not confirmed) to be E-Z-GO in origin into a 6-passenger. This is an unauthorized post-manufacture modification." [DN 207 at 27.] Further, Defendant argues that "Plaintiffs' sole argument of 'substantial similarity' is that the modified vehicle traveled 'downhill' and was somehow overturned." [*Id.*] The Court agrees with Defendant. Being that there is no allegation of overspeed, no information about any rear-wheel braking or yaw instability, and that this vehicle was modified post-manufacture, the Court finds that this incident has not been shown to be substantially similar to the incident in this case.

### 31. Reese McCall, Appendix Ex. 31

An E-Z-GO electric golf car rolled over. Upon inspection, no mechanical problems were found. Photographs of the scene show skid marks. An E-Z-GO Incident Report and photographs of the golf car and scene are attached at Appendix, Exhibit 31. This incident is substantially similar to the subject incident because it involved a rollover of an E-Z-GO golf car.

[DN 202 at 15.] The Court again finds that the mere fact that a rollover occurred is insufficient to show substantial similarity to the incident in this case. "Plaintiffs have not shown the grade of the hill, the speed of the vehicle at the time of incident, or that any allegations of rear-wheel only brake induced instability were asserted in this incident." [DN 207 at 27.] Accordingly, Plaintiffs have not met their burden of showing substantial similarity.

### 32. Golf Cart Overturned After Leaving Road, Teens Injured, Appendix Ex. 32

On March 10, 2013, a teenager was airlifted after being ejected from a golf car during a crash, which involved the overturning of the golf car. The golf car was manufactured by E-Z-GO in 1996. Both occupants of the golf car were teenagers. A news article concerning the incident is attached at Appendix, Exhibit 32. This incident is substantially similar to the subject incident because it involves an E-ZGO golf car that was overturned.

[DN 202 at 15.] The news article states "that three teenage boys . . . were traveling west in a golf cart . . . when the driver ran off the left side of the road. All three boys were ejected from the golf cart . . . when it overturned after leaving the road." [DN 201-32 at 2.] Once again, there is no information about whether there was overspeed, rear-wheel braking, or yaw instability. Rather, the information only reveals that the car "ran off the . . . road." Because the Court has repeatedly found that a rollover alone is insufficient, Plaintiffs have not met their burden of showing substantial similarity.

### 33. Child Injured After Ejected from Golf Cart, Appendix Ex. 33

Children were ejected from a golf car in Loxahatchee, Florida. A news article is attached at Appendix, Exhibit 33. This incident is substantially similar to the

subject incident because the occupants of the subject golf car were ejected from it during the rollover. Also, both incidents involve minors.

[DN 202 at 16.] Defendants point out that "[n]o identification of the manufacturer, age, or type of vehicle involved is made by Plaintiffs." [DN 207 at 29.] Additionally, contrary to Plaintiffs' contention, "[t]he record shows one child was 'ejected' by unknown means from the vehicle" but does not show that the vehicle rolled over. [*Id.*] Rather, the article simply states that the "children were riding in a golf cart when one was ejected onto the roadway." [DN 201-33 at 2.] Being that there is no evidence of a rollover, overspeed, rear-wheel brakes, or yaw instability, and that it is unclear which company manufactured this vehicle, the Court does not have enough information to find substantial similarity.

### 34. McCarty, Joshua, Appendix Ex. 34

This incident happened on May 19, 2013. Joshua McCarty, age 16, was standing on the rear step of an E-Z-GO golf car driven by Garrett DeVore 14 as the vehicle was being driven down a hill near the DeVores residence. McCarty was taken to MCG medical center after striking his head on the pavement.

[DN 202 at 16.] A news article about this incident states that a "teen was injured . . . after falling off the back of a golf car" and "striking his head on the pavement." [DN 201-34 at 5.] The article states that "[h]e lost his grip and landed head-first on the pavement." [*Id.*] The Court agrees, as Defendant argues in response, that "[n]o rollover occurred and none of Plaintiffs 4 points of inquiry are implicated in this incident." [DN 207 at 29.] Accordingly, no substantial similarity has been shown here.

### 35. Mary Mleziva, Appendix Ex. 35

John Mleziva lost control of a golf car on May 27, 2013. The golf car then overturned and came to rest on its side. The golf car was an E-Z-GO vehicle. Passengers were injured as a result of the crash. News articles about this incident are attached at Appendix, Exhibit 35. This incident is substantially similar to the subject incident because it involved an E-Z-GO vehicle and minors were involved in the incident.

[DN 202 at 16.] In response, Defendant states:

> As shown by D.E. 201-35, this incident involved eight (8) passengers on a golf car, four of whom where the grandchildren of the 72-year old driver (the children of one of the three other adult passengers). Mr. Mleziva was charged with reckless driving as he lost control of the golf car while driving on a public road, resulting in the overturn.

[DN 207 at 30; *see* DN 201-35 at 2.] There is no allegation of overspeed, rear-wheel braking, or yaw instability. Rather, the information only reveals that the driver "lost control." Accordingly, the Court agrees that Plaintiffs have not shown substantial similarity here.

### 36. Frye Island Maine, Appendix Ex. 36

> This incident happened on July 1, 2013. The material provided establishes that Frye Island Police Chief Rod Beaulieu said the limousine-style golf car with several rows of bench seating lost control [and rolled over] as it traveled down a long, gradual hill. "It started to wobble first and then the driver lost control," Beaulieu said. All seven passengers, ranging from adults to grade school-age children, were thrown from the cart. None were wearing seat belts. Beaulieu said he doesn't believe the cart was equipped with seat belts. Five people were taken to Maine Medical Center in Portland and treated for unspecified injuries. Beaulieu declined to characterize the nature of the injuries or to identify any of the people involved until his investigation is complete. One teenager and one adult were in serious condition.

[DN 202 at 16–17; DN 201-36 at 2.] Defendant argues:

> The documents attached at D.E. 201-36 show that a "limousine -style" vehicle was traveling down a gradual hill when the incident occurred. D.E. 201- 51, PageID #: 5617 shows that the police chief reported the vehicle had been "jacked-up with a 3" lift kit, tires were changed to narrow tires purchased ad Home Depot..." The modification to a "stretched" configuration was post-manufacture and done by an unknown person.

[DN 207 at 30 (citing DN 201-51 at 6).] The Court finds it significant that the vehicle in the Frye Island incident had been substantially modified and that it was a "limousine style" golf cart unlike the PX-4X in this case. *See Anderson*, 894 F.2d at 813 ("Substantial similarity existed in that the [prior] incidents to which the boat owners testified involved the *same model boat, the same hull*

*design, the same defect*, and a water intake occurring under circumstances similar in important respects to those present when the Sea Mar disappeared.") (emphasis added).

Moreover, there is no allegation of overspeed, rear-wheel brakes, or that the braking induced yaw instability which caused the rollover, as is alleged in this case. Although the article states that the golf cart "started to wobble first and then the driver lost control," [DN 201-36 at 2], and although Molly Kyle testified that the Vehicle in this case started to shake before it rolled over, there is still no evidence in the Frye Island incident of excessive speed or, importantly, that hitting the brakes *caused* the loss of control and the subsequent rollover. Because of the lack information about these issues and the fact that the golf cart in the Frye Island incident was a "limousine style" golf cart which had been substantially modified, the Court cannot say that this incident is substantially similar to the incident in this case.

### 37. Welch, Jennie, Appendix Ex. 37

Plaintiffs state that "[t]his incident happened on July 25, 2013. While on a downgrade, golf cart picked up speed and [began] vibrating severely. Passenger fell out, and died." [DN 202 at 17.] In response, however, Defendant states that "[t]his accident involve[ed] a golf car of unknown type, date, and manufacturer." [DN 207 at 31.] Defendant further argues:

> As noted in D.E. 201-37, Ms. Welch, the driver, and another male occupant, left a wedding reception where all three had been drinking heavily. The three were all occupying the two-person bench seat, with Ms. Welch in the far-right position. She fell out of the vehicle, with the other two occupants initially thinking she was "joking with them." PageID #: 5428. The driver was cited for operating a motor vehicle while intoxicated.

[*Id.*] Though the golf cart in the Welch incident was travelling fast down a hill, there is no allegation of a rollover, rear-wheel brakes, or rear-wheel brake-induced yaw instability. Additionally, in this case, it appears that alcohol consumption was a contributing factor, a fact not

in issue in this case. Further, it is unclear which company manufactured this vehicle. Overall, the Court finds that this incident is not substantially similar.

### 38. Nurses Injured in Rollover of Golf Cart, Appendix Ex. 38

On August 1, 2013, five nurses were injured . . . as a result of a golf car crash at Bradford Woods in Martinsville, Indiana. The golf car, which was an E-Z-GO model, was traveling downhill when it rolled over and ejected the nurses. One of the nurses was critically injured and taken to a hospital via medial helicopter. Despite damage from the crash, a mechanical inspection from Professional Golfcar Corporation revealed that the brake cables were in "very good shape" and the brake shoes and hubs were in "excellent shape." Two news reports, an Incident Report, and three inspection-related documents from Professional Golfcar Corporation are attached at Appendix, Exhibit 38. This incident is substantially similar to the subject incident because it involves a similar E-Z-GO golf car that was traveling downhill and rolled over.

[DN 202 at 17–18.] However, the news article in Plaintiffs' Appendix states only that "[t]he golf cart was going down a paved road at the facility when it rolled onto its side and ejected the nurses." [DN 201-38 at 2.] There is no allegation about overspeed, rear-wheel brakes, or brake-induced yaw instability. In the Court's view, the mere fact that the vehicle rolled over is insufficient for a finding of substantial similarity. Additionally, Defendant argues that the "vehicle was overloaded" and that it "was modified post-manufacture . . . to enable it to carry a maximum of four passengers," but that five were riding it during the incident. [DN 207 at 32.] According to Defendant, Plaintiffs have not "shown that this after-manufacture modified gas-powered vehicle was similar to the electric powered PC-4X involved in this litigation." [*Id.*] Taking all of these considerations together, the Court agrees that Plaintiffs have not shown substantial similarity.

### 39. Mark Martinez, Appendix Ex. 39

A 10-year-old boy who suffered a severe head injury when the golf car he was riding overturned died on September 8, 2013. A photograph of the golf car, two news articles, and an email from Jim Fisher (EZGO) to Peter Dubrawski and John Rupp, dated September 10, 2013, are attached at Appendix, Exhibit 39. This incident is substantially similar to the subject incident because it involves the

overturning of a golf car, the use of a golf car by minors, and a severe head injury caused by the overturning golf car.

[DN 202 at 18.] In response, however, Defendant points out that "the modified golf car is of unknown manufacturer, type, and age, and has not been identified as an E-Z-GO product." [DN 207 at 33.] Additionally, Defendant argues that "the vehicle was overloaded at the time of the accident" and that it had been modified post-manufacture. [DN 207 at 33.] Further, there is no allegation that the golf car overturned, that it was travelling down a hill, that there was excessive speed, rear-wheel brakes, or brake-induced yaw instability. Without more information, the Court cannot say that the substantially similar standard has been met.

## 40. Vance, Rodney, Appendix Ex. 40

Plaintiff states: "This incident occurred on October 8, 2013. The description from [T]extron's database states 'driving down a steep cart path when brakes allegedly locked on wet leaves.' No other documents were provided." [DN 2-2 at 18.] In response, Defendant argues that this "accident occurred because a failure to maintain the cart path clear of wet debris" and further that "the vehicle involved, an RXV, is equipped with regenerative brakes and is not substantially similar to the 1993 PC-4X with rear-wheel mechanical brakes as involved in this litigation." [DN 207 at 33.] Due to the differences in the brake designs of the vehicles and the presence of wet leaves on the path, the Court cannot say that the circumstances of the Vance incident are substantially similar to those of the current case. *See Anderson*, 894 F.2d at 813 ("Substantial similarity existed in that the [prior] incidents to which the boat owners testified involved the *same model boat, the same hull design, the same defect*, and a water intake occurring under *circumstances similar in important respects* to those present when the Sea Mar disappeared.") (emphasis added).

**41. Golfer Injured When Golf Cart Turned Over on Slippery Slope, Appendix Ex. 41**

"This incident happened on April 11, 2014. A golfer was injured when the cart flipped on a slippery slope. A New York appellate court permitted the golfer to sue the golf course operators. A news article is attached at Appendix, Exhibit 41." [DN 202 at 18.] According to the news article, the golfer "was injured when the cart flipped over while he drove down a slippery slope." [DN 201-41 at 2.] The "cart overturned while he was going down a 'steep and winding' cart path," but the driver "insisted he was driving 'slowly and cautiously' when the accident occurred." [*Id.*]

In response, Defendant alleges that "Plaintiffs fail to inform the Court that the manufacturer and type of golf car are unknown, the subject golf car has not been alleged to have been an E-Z-GO product, and the Appellate Division held that the triable issue of fact was whether the vehicle had bald tires at the time of the accident." [DN 207 at 24.] Taking all of these circumstances into consideration, the Court agrees that Plaintiffs have not shown substantial similarity here. The issue in this incident was alleged "bald tires," and as opposed to alleging overspeed, the driver claimed that he was driving slowly.

**42. Jackson, John and Angelo, Appendix Ex. 42**

> This incident happened on May 25, 2014. New reports describe the incident as involving 13- and 16-year-olds who were injured while driving a golf car down a hill. The brakes of the golf car were reported to have locked up, causing the rollover. The 13-year-old occupant was dragged by the vehicle and required staples in his head.

[DN 202 at 19.] Once again, however, "the manufacturer and type of golf car involved in this incident are unknown." [DN 207 at 34.] Because it is unknown what make and model the golf cart was and because there is no allegation of overspeed, rear-wheel braking, or brake-induced yaw instability, all of which are alleged in the current case, the Court agrees that there is insufficient information to find substantial similarity. *See Anderson*, 894 F.2d at 813 ("Substantial similarity

existed in that the [prior] incidents to which the boat owners testified involved the *same model boat, the same hull design, the same defect*, and a water intake occurring under *circumstances similar in important respects* to those present when the Sea Mar disappeared.") (emphasis added).

### 43. Workman, Claudia, Appendix Ex. 43

"This incident happened on June 1, 2014. A woman was reportedly killed after being ejected when the golf car she was riding overturned." [DN 202 at 19.] However, "the golf car involved . . . was manufactured by Club Car, not E-Z-GO." [DN 207 at 35.] Additionally, there is no allegation that the vehicle was being operated on a hill, reached excessive speed, had rear-wheel brakes, or experienced rear-wheel brake-induced yaw instability. Accordingly, the Court does not find that substantial similarity has been shown here. *See Anderson*, 894 F.2d at 813 ("Substantial similarity existed in that the [prior] incidents to which the boat owners testified involved the *same model boat, the same hull design, the same defect*, and a water intake occurring under *circumstances similar in important respects* to those present when the Sea Mar disappeared.") (emphasis added).

### 44. Castellano, Heath and Jack, Appendix Ex. 44

"This incident happened on February 22, 2015. It was reported that the golf car's brakes locked up, causing the vehicle to spin and rollover onto the passenger side." [DN 202 at 19.] The incident report states that the "[c]ar was driven down hill on car path that was wet due to rain and when turning left the car flipped over and land[ed] on top of occupant." [DN 201-44 at 7.] Defendant further points out that "the vehicle involved, an RXV electric, was equipped with regenerative brakes and is not substantially similar to the 1993 PC-4X with rear-wheel mechanical brakes as involved in this litigation." [DN 207 at 35.] Because the RXV is a different model vehicle with an entirely different braking system than the 1993 PC-4X involved in this case, and because

the path in the *Castellano* incident was "wet due to rain," unlike in this case, the Court agrees that an incident involving that vehicle cannot be said to be substantially similar to the incident in this case. *See Anderson*, 894 F.2d at 813 ("Substantial similarity existed in that the [prior] incidents to which the boat owners testified involved the *same model boat, the same hull design, the same defect*, and a water intake occurring under *circumstances similar in important respects* to those present when the Sea Mar disappeared.") (emphasis added).

## 45. Leghart, Shannon, Appendix Ex. 45

For this incident, Plaintiffs state "*See* Deposition of Sandra Jack from Leghart v. Textron, Inc. (attached)." [DN 202 at 19.] So far as the Court can tell, the plaintiff in that case, Leghart, alleged a defect with the "steering housing," "steering assembly," or "steering assembly rack" on a TXT model golf car. [*See* DN 201-45 at 16–18, 24–26, 36.] It appears, as Defendant argues, that "[t]he underlying cause of action alleged a defect in the steering column of the golf car, and no allegations of braking defect were alleged" in that case. [DN 207 at 35.]

However, the majority of Jack's deposition from the Ledhart case deals with the collecting, retention, and searching of Textron's databases. It appears to the Court that, rather than arguing that the Leghart incident was substantially similar to the incident in this case, Plaintiffs argue that this proof relates to:

> the importance of a corporate safety program. In order to implement and conduct a meaningful corporate safety program, Textron *must* investigate and maintain the details of all in-service events, wrecks and collisions. The "substantially similar" requirement is completely irrelevant in this context. The evidence developed by Plaintiffs establishes that Textron failed in its duty to conduct a meaningful corporate safety program, reflecting its absence of concern for protecting foreseeable users of its products from foreseeable life-threatening and dangerous events.

[DN 202 at 1–2.] However, because there is no suggestion that the Leghart incident is substantially similar to the incident in this case, this incident will be excluded. The Court has dealt with the admissibility of this evidence as it relates to Defendant's corporate safety program in other orders.

## 46. Jackson, Lora Madonna, Appendix Ex. 46

Here, Plaintiffs state only "Affidavit of Michael Skibo." [DN 202 at 19.] Michael Skibo began working for Textron in March of 2000 in the Information Technology department. [DN 201-46 at 2.] He explained that "[t]he Legal Department went live with the TeamConnect matter management application in March 2004. By June 2004 there was no data from Corporate LawPack system on Textron's servers." [*Id.*] Skibo further stated that, [t]o the extent any data from the Corporate LawPack application was backed up on tape it would have been written over by August 2004." [*Id.* at 3.] However, "[n]o information or allegations regarding substantially similar incidents is contained in this attachment." [DN 207 at 36.] Accordingly, the Court will exclude it. The Court has dealt with the admissibility of this evidence as it relates to Defendant's corporate safety program in other orders.

## 47. Golf Cart Rollover Traveling Downhill, Appendix Ex. 47

It appears that Plaintiffs inadvertently included this incident twice. The Court already addressed the Frye Island incident above at incident number 36. As the Court explained above, the available information for this incident is insufficient to meet the substantial similarity standard for admissibility.

CONCLUSION

For the reasons stated in detail above, Defendant's motion in limine to exclude any references to and all evidence of prior and post-accident unrelated claims and other accidents, [DN

166], is **GRANTED IN PART AND DENIED IN PART**. Plaintiffs will be permitted to offer evidence of incident numbers 7, 8, 9, 12, 14, 16, 17, 18, 21, and 23 at trial.

Date:

cc:     Counsel